COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                                 NO.
2-09-238-CV

 

 

RYAN ESQUIVEL                                                                               APPELLANT

 

                                                             V.

 

JPM REALTY PROPERTY                                                                  APPELLEES



MANAGEMENT,
INC. AND 

JPM
REALTY INVESTMENTS, INC.

 

                                                       ------------

 

               FROM
THE 96TH DISTRICT COURT OF TARRANT COUNTY

 

                                                       ------------

 

                                      MEMORANDUM OPINION[1]

 

                                                       ------------

I. 
Introduction

In
two issues, Appellant Ryan Esquivel appeals the trial court=s
grant of summary judgment for Appellees JPM Realty Property Management, Inc.
and JPM Realty Investments, Inc. (collectively AJPM@).  We affirm.

 








II. 
Procedural Background 

Esquivel
sued JPM, Avery Pointe apartment complex=s
management firm, for premises liability after he was injured in Avery Pointe=s
pool areaCto
wit, while a guest in the pool area, the Aseat
slab@ of
a concrete bench fell on his hand.  Among
other grounds, JPM moved for summary judgment on the ground that there was no
evidence that it knew of the allegedly dangerous condition. Esquivel attached
the following to support his response: 
his deposition; the affidavit of Jack Shatley, one of the owners of
Tex-Art Stone, Inc., which manufactured and installed the concrete bench; the
deposition of Ljudmilla Corral, an Avery Pointe tenant; photographs of the pool
area and the bench; and the affidavit of Edward Esquivel, his father.[2]  The trial court granted summary judgment for
JPM.

III. 
Summary Judgment

In
two issues, Esquivel complains that he produced more than a scintilla of
probative evidence in response to JPM=s
summary judgment grounds and that his comparative negligence is a fact question
for the jury that precludes summary judgment.

A.  Standard of Review








After
an adequate time for discovery, the party without the burden of proof may,
without presenting evidence, move for summary judgment on the ground that there
is no evidence to support an essential element of the nonmovant=s
claim.  Tex. R. Civ. P. 166a(i).  The motion must specifically state the
elements for which there is no evidence. 
Id.; Timpte Indus., Inc. v. Gish, 286 S.W.3d 306, 310
(Tex. 2009).  The trial court must grant
the motion unless the nonmovant produces summary judgment evidence that raises
a genuine issue of material fact.  See
Tex. R. Civ. P. 166a(i) & cmt.; Hamilton v. Wilson, 249 S.W.3d 425,
426 (Tex. 2008).

When
reviewing a no-evidence summary judgment, we examine the entire record in the
light most favorable to the nonmovant, indulging every reasonable inference and
resolving any doubts against the motion. 
Sudan v. Sudan, 199 S.W.3d 291, 292 (Tex. 2006).  We review a no‑evidence summary
judgment for evidence that would enable reasonable and fair‑minded jurors
to differ in their conclusions.  Hamilton,
249 S.W.3d at 426 (citing City of Keller v. Wilson, 168 S.W.3d 802, 822
(Tex. 2005)).  We credit evidence
favorable to the nonmovant if reasonable jurors could, and we disregard
evidence contrary to the nonmovant unless reasonable jurors could not.  Timpte Indus., Inc., 286 S.W.3d at 310
(quoting Mack Trucks, Inc. v. Tamez, 206 S.W.3d 572, 582 (Tex.
2006)).  If the nonmovant brings forward
more than a scintilla of probative evidence that raises a genuine issue of
material fact, then a no-evidence summary judgment is not proper.  Smith v. O=Donnell,
288 S.W.3d 417, 424 (Tex. 2009).








The
trial court did not specify any grounds in its final judgment.[3]  When a trial court=s
order granting summary judgment does not specify the ground or grounds relied
on for its ruling, summary judgment will be affirmed on appeal if any of the
theories presented to the trial court and preserved for appellate review are
meritorious.  Provident Life &
Accident Ins. Co. v. Knott, 128 S.W.3d 211, 216 (Tex. 2003); Star-Telegram,
Inc. v. Doe, 915 S.W.2d 471, 473 (Tex. 1995).

B.  Premises Liability








To
succeed on a premises liability claim, an invitee must prove that (1) a
condition of the premises created an unreasonable risk of harm to the
invitee;  (2) the owner knew or
reasonably should have known of the condition; (3) the owner failed to exercise
ordinary care to protect the invitee from danger; and (4) the owner=s
failure was a proximate cause of injury to the invitee.  Fort Brown Villas III Condo. Ass=n,
Inc. v. Gillenwater, 285 S.W.3d 879, 883 (Tex. 2009).  If the owner or occupier did not create the
condition, it must have existed long enough for the owner or occupier to have a
reasonable opportunity to discover itCthe Atemporal
element@ of
premises liability.  See Wal-Mart
Stores, Inc. v. Reece, 81 S.W.3d 812, 814 (Tex. 2002); see also
Hunnicutt v. Dallas/Fort Worth Int=l
Airport Bd., No. 02-08-00297-CV, 2009 WL 2356858, at *2
(Tex. App.CFort
Worth July 30, 2009, pet. denied) (mem. op.) (A>[T]here
must be some proof of how long the hazard was there before liability can be
imposed on the premises owner for failing to discover and rectify, or warn of,
the dangerous condition.=@).

C.  Summary Judgment Evidence

No
one disputes that Esquivel was an invitee or that his injury involved a large
concrete bench comprised of a curved seat supported by two pedestals.
Photographs reveal that this bench and two others of the same design were
grouped around a table in the Avery Pointe swimming pool area. 

1.  Esquivel=s
Deposition

Esquivel
testified that on July 31, 2005, he and two other teenagers, one of whom was an
Avery Pointe tenant, spent around two hours in the pool area where the bench
was located.  An eight- or nine-year-old
boy and his mother were there at the same timeCthe
boy had a Awater
noodle@
that he used to hit Esquivel.  Esquivel
stated that he and the others did not run in the pool area; he also testified, AI
did not run atCdirectly
at the bench.@  When he decided to get out of the pool, Athe
boy followed me, you know, hitting me repeatedly [with the water noodle] and I approached
the bench and I told the boy, okay, that=s
enough.  And I attempt[ed] to sit down on
the bench, but next thing I know that happened, it just collapsed and past that
I don=t
really remember much.@ As soon as he made contact
with the bench, it collapsed onto his right hand.








Esquivel
claimed that his father inspected the other benches on the day of the accident
and told him Athat
they [the seats] did not come off like this one did@ and
Athat
there was some kind of adhesive on the bottom of the bench to keep it in place.@  Esquivel stated that all of the benches
looked the same that day, that he had no way of knowing that this particular
bench was going to collapse, and that he did not know if the apartment complex
knew about Athe
allegedly dangerous condition.@

Two
photos were included with Esquivel=s
depositionCwhen
asked who took them, he stated, AI
imagine my father.@  He did not know when the photos were
taken.  One photo shows the top of the
bench on the ground, leaning against the two pedestals.  The other shows the bench put back together
and indistinguishable from the other two benches nearby.

2.  Shatley=s
Affidavit

Shatley
stated in his affidavit that he was one of the owners of Tex-Art Stone, Inc.,
which manufactures and installs concrete benches.  Prior to July 2005, Tex-Art Stone
manufactured and installed several concrete table and bench sets in the Avery
Pointe swimming pool area.  He asserted, 

These
benches were properly set up at the time of delivery.  I am not aware of any defect in the concrete
benches manufactured by Tex-Art Stone, Inc. that were sold to Avery Pointe. . .
.  In addition, on 8-13-08, I personally
inspected the concrete benches in the swimming pool area at Avery Pointe and
found them to be set up properly at that time.

 








I
have reviewed a copy of [Esquivel=s
petition and his deposition].  There has
never [sic] an incident reported to Tex-Art Stone, Inc. in which a concrete
bench seat has collapsed as described by Ryan Esquivel in [his petition and
deposition].  In addition, I have been
actively employed in this industry for more than 30 years.  Assuming that the bench in question was
positioned adequately, it is my opinion that the bench seat could not have
collapsed as described by Ryan Esquivel in his [deposition and petition].

3.  Corral=s
Deposition

Corral
testified that she had lived at Avery Pointe since 2003.  On July 31, 2005, she and her son were in the
pool area when two boys[4]
a couple of years older than her son were there.  Prior to the accident, her son played with
them.  Corral described the playing as
running and kicking each other outside of the pool, splashing in the pool, and
picking up her son and throwing him in the waterCroughhousing,
essentiallyCAup
to the point when [she] asked them to quit playing with her son@
because she did not want him to get hurt. 
The boys respected her request, and she left the pool area to join some
friends outside the pool area.  She could
see the boys continue to run around the pool area from her vantage point
outside the pool areaCthey would get out of the
pool and then run to jump back into the pool. 
The accident occurred between thirty minutes to an hour later.








Corral
testified that she was looking at the pool from outside the pool area and saw
the boys runningCthe reason she was looking
at the pool was because A[she] was continuously
telling them, quit running.@  Esquivel slipped and then she heard a loud
noise A[l]ike
somebody fell.@  She did not see the accident occur, but her
son explained to her what had happened because he had remained in the pool area
when she left.  Corral testified that her
son Atold
[her] that boys were running and the boy, [Esquivel], he slipped.  And when he slipped his feet pushed theCthe
standingCthe
side of the bench, he pushed in, and the top fell on his hand when he was
falling down.@  When she arrived in the pool area, she saw
Esquivel, who was screaming, sitting on the ground and holding his hand.  His feet were toward the bench, and the top
of the bench was on the ground.

Corral
subsequently gave a statement in around 2006 to someone at the apartment
manager=s
office.  Esquivel=s
counsel produced three pages of notes from that interview.[5]  After she reviewed the interview notes, she
stated that everything but the following appeared to be correct: 

I
cannot recall 100% what did I told [sic] to that gentleman.  But I don=t believe I said the bench is unstable,
because the bench is very heavy.  And
that=sCit takes really big
force to knock it over.  So I don=t believe I ever
mentioned unstable bench.  Or something
like calling it hazardous.[6]








She admitted that it was
possible that she had told the interviewer that the bench was unstable and
hazardous.  But she also indicated that
it was possible that she might have come up with the idea that the bench was
unstable because of the severity of Esquivel=s
injury.

Corral
described the pool area as gated, with holly bushes around the inside of the
fence that did not obstruct the view from the outside.  She stated that at some point between 2003
and 2005, Avery Pointe acquired the concrete outdoor furnitureCit
put up the fence and added locks to the pool gate at the same time.  She was not present when the benches were
delivered or installed.  Corral stated
that prior to July 2005, she had sat on the concrete benches, found them very
sturdy, and had never experienced the top of the bench slipping.  She had never seen the bench topple over from
someone sitting on it, and she testified that she Ahad
no clue there was tape@ installed on the bottom of
the concrete bench.

4.  Edward Esquivel=s
Affidavit and Photos

Esquivel=s
father stated in his affidavit that Esquivel=s
injury occurred Aas the result of the seat >slab
portion= of
a concrete bench falling and entrapping his right hand.@  He stated, 








On
August 1, 2008 I went to the swimming pool area of the premises known as Avery
Pointe at Cityview for the purpose of taking photographs of the concrete bench
which caused the injury to my son[.] . . . 
The pictures marked Exhibits AD@ and AE@ are the pictures that I took on that day.

 

Exhibit AD@
shows part of the top portion of the bench slightly removed from one of its
pedestals.  Exhibit AE@
shows the top portion of the bench completely removed from its pedestals and
leaning against them.

D.  Analysis








The
supreme court affirmed a no-evidence summary judgment on the actual or
constructive knowledge ground in a recent, remarkably similar premises
liability case.  Gillenwater, 285
S.W.3d at 880, 883B84.  While lowering himself into a pool-side chair
near a condominium swimming pool, Gillenwater lost the tip of his right finger
to a broken weld on the chair=s
frame. Id. at 880.  He offered
photographs of the chair taken by an insurance adjuster after the injury and
the deposition of Frank Collins, the condominium manager, as evidence to
support an inference that the chair was already broken and that the broken
welds were easily visible to the naked eye prior to the accident.  Id. at 883.  Collins=s
testimony included that it was the condominium=s
responsibility to maintain the outdoor equipment in a safe condition, that he
first became aware of the injury the day after the incident, that he had an
associate=s
degree in welding, that he knew the combination of chlorine and salt water in
the air had a corrosive effect on metal chairs by the pool, and that he had an
employee inspect, wash, and clean all outdoor lounge chairs by the pool
(including the chair at issue) six days a week. 
Id.  Gillenwater and
Collins inspected the chair the day after the injury, and the broken weld was
visible to both men and was on the same side of the chair where Gillenwater had
placed his hand; Collins inspected the other chairs by the pool, found Ahairline
cracks@ in
those chairs, and repaired or replaced them. 
Id.

The
supreme court held that the evidence only established Athat
Collins first became aware of the injury and the chair=s
condition the day after the injury occurred. . . .  The fact that Gillenwater=s
fingertip was severed and that the chair broke is evidence that a dangerous
condition existed, but it offers no evidence as to how long it existed.@  Id. at 883B84
(emphasis added).

Esquivel
argues that he produced more than a scintilla of probative evidence that JPM
had actual or constructive knowledge of the dangerous condition of the concrete
bench.  He states:

As discussed above, the
summary judgment evidence (produced by both parties):  Esquivel=s
deposition testimony, the affidavit of Edward Esquivel and the photographs
showing the presence of the adhesive tape between the top of the column of the
bench and the underside of the concrete seat slab.  Additionally, Corral=s
deposition testimony confirms that the top of the bench was heavy and that,
following Esquivel=s injury, she saw the pillar
knocked over and the top portion of the bench on the ground.  The sheer weight of the concrete bench
(between 200B300
lbs) and [the] existence of the adhesive tape support that JPM either caused
the harmful condition of the bench by using the adhesive tape to try to secure
the concrete bench, that JPM knew of the harmful condition of the concrete
bench and negligently failed to remove it[,] or prove[s] the harmful condition
was present for so long that it should have been discovered or removed in the
exercise of reasonable care.








We
disagree.  Like in Gillenwater,
nothing in the record here shows that JPM created, knew about, or could have
discovered the dangerous condition before the incident occurred on July 31,
2005.  JPM bought the bench from Tex-Art
at some point after Corral moved to Avery Pointe in 2003 and before July 2005,
and Tex-Art installed it with at least two other benches that are represented
in the photographs.[7]  Shatley, the bench=s
manufacturer, testified that he was not aware of any defects in the benches
that Tex-Art sold to Avery Pointe and that the benches were properly set up
when delivered.  He personally inspected
them three years later, on August 13, 2008, and found them to be properly set
up.  His affidavit did not address
whether an adhesive is used in the benches=
manufacture or assembly.  Corral
testified that prior to the July 31, 2005 incident, she sat on the benches,
found them to be sturdy, had never seen anyone else sit on the bench and have
it topple over, and Ahad no clue there was tape@ on
the bottom of the concrete bench.








Esquivel
testified that all of the benches looked the same and that he had no way of
knowing that this particular bench was going to collapse.  Although he referred to A[a]
type of adhesive used on the pedestal to secure the bench@ as
an actual defect in the bench and said that his father told him Athat
there was some kind of adhesive on the bottom of the bench to keep it in place,@ he
did not know if the other benches also used adhesive.  Further, he testified that he did not know
whether the bench had ever fallen before, whether anyone else had ever been
injured because of the bench, or whether the apartment complex knew about Athe
allegedly dangerous condition@
before his injury.

The
interview notes, which reflect that Corral told the interviewer that she
thought the bench was unstable; that its seat was not attached to its legs;
that when she went into the pool area, she saw the seat lying on its side; and
that it could be a hazard since the seat was not attached to the legs, are from
an interview given by Corral after the July 31, 2005 incident.  Nothing in the interviewer=s
notes references any sort of adhesive or adhesive tape on the bench at that
time.  Edward=s affidavit
reflects that he went to the apartment complex on August 1, 2008, three years
after the incident, and took photographsChe
does not mention anything about an adhesive or adhesive tape in his affidavit.








On
the record here, there is no evidence that JPM knew or could have discovered
before the July 31, 2005 incident that the bench was defective or that JPM, as
opposed to the manufacturer and installer, Tex-Art, or an Avery Pointe tenant,
knew about the alleged adhesive or adhesive tape or placed it there to keep the
bench seat attached to its legs.  See
Gillenwater, 285 S.W.3d at 883B84; see
also Parks v. State & Ale of Tex., Inc., No. 01-04-00080-CV, 2006 WL
66428, at *3 (Tex. App.CHouston [1st Dist.] Jan. 12,
2006, pet. denied) (mem. op.) (stating, in suit to recover for injuries
sustained by restaurant patron when his chair broke, that patron failed to
direct the court to anything that would create a material fact issue regarding
whether the manager or anyone else at Steak & Ale knew or should have known
that the chair created an unreasonable risk of harm).  Therefore, we overrule Esquivel=s
first issue.  And because we conclude
that the trial court did not err by granting JPM=s
no-evidence motion for summary judgment, we do not reach Esquivel=s
second issue on comparative negligence as a fact issue precluding summary
judgment.  See Tex. R. App. P.
47.1.

IV. 
Conclusion

Having
overruled Esquivel=s dispositive issue, we
affirm the trial court=s judgment.

 

BOB MCCOY

JUSTICE

 

PANEL:  LIVINGSTON, C.J.; DAUPHINOT and MCCOY, JJ.

DELIVERED:  July 1, 2010











[1]See Tex. R. App. P.
47.4.





[2]JPM also attached
Esquivel=s and Corral=s depositions and the
Shatley affidavit to its motion.





[3]The trial court
issued a letter ruling prior to issuing its judgment, stating,

I have completed my
review of plaintiff=s evidence in
response to defendants= Ano-evidence@ motion for summary
judgment and find that there is (1) no evidence of a dangerous condition and
(2) no evidence that the owner-occupier of the premises had actual or
constructive knowledge of a dangerous condition; therefore, defendants= motion for summary
judgment is granted.





[4]After Corral reviewed
a statement from her earlier interview about the incident, she saw that she had
said that there were three teenaged boys. 
She said it was possible that there were three boys instead of twoCthree years had
passed since the accident.





[5]The statement was
included as a deposition exhibit.





[6]The notes reflect
that she stated 

 

that the bench is a
large heavy concrete bench and she believes the bench to be unstable.  Ms. Corral[] stated that the seat of the
bench is not attached to the concrete legs of the bench and that upon coming
into the pool area, she observed the seat of the bench lying on its side. 

 

.
. . .

 

Ms. Corral[] stated
that she believes the bench could be a hazard, since the seat is not attached
to the legs.  However, she does not
believe this incident would have occurred, had the boys not been running around
the pool area.  Ms. Corral[] stated that
it would take a lot of force to knock off the seat of the bench and had the
claimant not been running and falling, then the seat would not have come off.





[7]Contrary to Esquivel=s assertion that
adhesive tape can be seen in Exhibits AD@ and AE,@ the poor reproduction quality of the
photographs in the record does not reveal this feature.  Nonetheless, assuming that there is adhesive
tape on the bench, or that there is some sort of adhesive as referenced in Esquivel=s deposition, it does
not follow from its mere presence either that JPM knew about it prior to July
31, 2005, or that JPMCas opposed to Tex-Art
or an Avery Pointe tenantCplaced it there.  Less than a scintilla of evidence exists when
the evidence is so weak that it does nothing more than create a mere surmise or
suspicion of a fact.  Kindred v.
Con/Chem, Inc., 650 S.W.2d 61, 63 (Tex. 1983).