

# COURT OF APPEALS

### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-10-00267-CV

JUDITH MACDONALD,
INDIVIDUALLY AND AS
REPRESENTATIVE OF THE ESTATE
OF WALTER MACDONALD,
STEPHANIE LYNN MACDONALD,
THOMAS WAYNE MACDONALD,
TREVOR MACDONALD, AND
WAYNE J. MACDONALD

APPELLANTS

V.

HARRIS METHODIST HEB
HOSPITAL

APPELLEE

----------

FROM THE 153RD DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

This is an appeal from summary judgment orders in favor of appellee

Harris Methodist HEB Hospital in a health care liability suit. Appellants, the

---

[1]*See* Tex. R. App. P. 47.4.

family of Walter MacDonald, bring two issues in which they contend they provided sufficient evidence of causation to defeat appellee's summary judgment motions. We reverse and remand.

**Background**

Walter MacDonald was diagnosed at the hospital with an aortic dissection. Initially, the care for his particular type of dissection involved only medical management in a hospital setting rather than surgery. Over the course of his hospital stay, however, his small bowel became ischemic and eventually infarcted, or died. By the time doctors attempted to operate on MacDonald on Tuesday afternoon, September 26, 2006, they could not repair the bowel, and he died. Appellants sued appellee claiming that the nursing staff failed to timely report significantly changed lab values to MacDonald's doctor, David Carter. After appellee filed a traditional motion for summary judgment on appellants' claims, appellants added an additional negligence claim and designated an additional expert, contending that the nurses had also failed to report a highly elevated respiratory rate that indicated MacDonald had become acidotic, a side effect of the ischemia in the small bowel. Appellee then filed a motion for no-evidence summary judgment on the additional negligence claim. The trial court granted the traditional summary judgment as to the allegation that the nurses failed to timely report the lab values to Dr. Carter; however, the trial court stated that it was not ruling on the newly added claim about the failure to report the

2

elevated respiratory rate.[2]  Appellee then filed a second motion for no-evidence summary judgment on the second claim, almost identical to the first motion; the trial court granted that motion.  Appellants appeal the trial court's rulings on both summary judgment motions.

## Standards of Review

We review a traditional summary judgment de novo.  *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010).  We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding evidence contrary to the nonmovant unless reasonable jurors could not.  *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009).  We indulge every reasonable inference and resolve any doubts in the nonmovant's favor.  *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008).  A defendant who conclusively negates at least one essential element of a cause of action is entitled to summary judgment on that claim.  *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010); *see* Tex. R. Civ. P. 166a(b), (c).

---

[2]The trial court's letter ruling is somewhat confusing because it initially purports to grant the no-evidence summary judgment, which challenged only the new respiratory rate allegation, yet it also states that no ruling was being made as to the respiratory rate allegation.  The record in its entirety shows that the trial court meant to grant only two motions:  the traditional motion challenging the failure-to-report-lab-values claims and the no-evidence motion challenging the new failure-to-report-elevated-respiratory-rate claims added in the second amended petition.

3

After an adequate time for discovery, the party without the burden of proof may, without presenting evidence, move for summary judgment on the ground that there is no evidence to support an essential element of the nonmovant's claim or defense. Tex. R. Civ. P. 166a(i). The motion must specifically state the elements for which there is no evidence. *Id.*; *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009). The trial court must grant the motion unless the nonmovant produces summary judgment evidence that raises a genuine issue of material fact. *See* Tex. R. Civ. P. 166a(i) & cmt.; *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008).

When reviewing a no-evidence summary judgment, we examine the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion. *Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006). We review a no-evidence summary judgment for evidence that would enable reasonable and fair-minded jurors to differ in their conclusions. *Hamilton*, 249 S.W.3d at 426 (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005)). We credit evidence favorable to the nonmovant if reasonable jurors could, and we disregard evidence contrary to the nonmovant unless reasonable jurors could not. *Timpte Indus.*, 286 S.W.3d at 310 (quoting *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006)). If the nonmovant brings forward more than a scintilla of probative evidence that raises a genuine issue of material fact, then a no-evidence summary judgment is not proper. *Smith v. O'Donnell*, 288 S.W.3d 417, 424 (Tex. 2009); *King Ranch, Inc.*

4

*v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003), *cert. denied*, 541 U.S. 1030 (2004).

**Notice of Appeal Sufficient to Review Both Summary Judgments**

In a letter brief, appellee contends that appellants' traditional summary judgment is not a proper subject of the appeal because the notice of appeal references only the July 6, 2010 no-evidence summary judgment and "ancillary rulings," and the prior, traditional summary judgment is not an ancillary ruling.[3] Thus, according to appellee, rule 25.1 deprives this court of jurisdiction to consider the traditional summary judgment in this appeal. Tex. R. App. P. 25.1.

The July 6, 2010 order granting the no-evidence summary judgment is the final order disposing of any remaining pending claims and parties in the case; thus, neither of the summary judgments was appealable until that order was signed. *See Lehmann v. Har-Con Corp.*, 39 S.W.3d 191, 192 (Tex. 2001). The filing of a notice of appeal invokes the appellate court's jurisdiction over all parties to the trial court's judgment or order appealed from. Tex. R. App. P. 25.1(b). Nothing in rule 25.1 limits the issues that a party may raise on appeal after having properly invoked our jurisdiction. *See Anderson v. Long*, 118 S.W.3d 806, 809 (Tex. App.—Fort Worth 2003, no pet.); *see also Webb v. Jorns*, 488 S.W.2d 407, 408–09 (Tex. 1972) (holding that unsevered, partial summary judgment order was merged into trial court's final judgment). Rather, the

---

[3]We grant appellee's "Motion for Leave to Amend Appellee's Brief Concerning Only the Proper Claims on Appeal" requesting to raise this argument.

limitation of appellate issues is governed by other appellate rules that are not applicable here. *See, e.g.*, Tex. R. App. P. 33.1, 34.6(c); *Anderson*, 118 S.W.3d at 809–10. The requirement in rule 25.1(d) that the notice of appeal must state the date of the judgment or order appealed from does not limit what trial court rulings may be challenged on appeal. Tex. R. App. P. 25.1(d); *Anderson*, 118 S.W.3d at 810; *see Valls v. Johansen & Fairless, L.L.P.*, 314 S.W.3d 624, 631 n.7 (Tex. App.—Houston [14th Dist.] 2010, no pet.) ("A notice of appeal need not identify every adverse interlocutory ruling the appellant intends to challenge; instead, the notice must state only the date of the judgment or order from which he appeals—in this case, the order granting summary judgment."). Instead, the date of the judgment appealed from is used to determine whether the appeal is timely. *Anderson*, 118 S.W.3d at 810; *see* Tex. R. App. P. 26.1; John Hill Cayce, Jr., et al., *Civil Appeals in Texas: Practicing Under the New Rules of Appellate Procedure*, 49 Baylor L. Rev. 867, 886 (1997). Accordingly, we reject appellee's contention that rule 25.1 limits our jurisdiction to review any summary judgment granted before the July 6, 2010 no-evidence summary judgment.

## Traditional Motion for Summary Judgment

In their first issue, appellants claim that they raised a fact issue sufficient to defeat appellee's traditional motion for summary judgment.

The thrust of appellee's traditional motion for summary judgment is that appellants cannot prove that the nurses' failure to report MacDonald's out-of-range lab results to his surgeon, Dr. Carter, was a proximate cause of his death.

6

According to appellee, Dr. Meltzer, the nephrologist whom Dr. Carter consulted regarding MacDonald's condition, testified in his deposition about the lab values, "There really isn't much on there that I think would catch a nurse's eye and that they would . . . say 'I better call Dr. Meltzer about this one.' . . . . I don't think there's much here that I would expect to catch a nurse's eye." Appellee contends that this testimony shows that neither Dr. Carter nor Dr. Meltzer would have placed any significant value on these lab results and thus the evidence does not support a breach of duty or proximate causation.

**Applicable Facts**

Appellants' expert, Dr. Wayne Flye, a vascular surgeon, agreed in his deposition testimony that his expert report was "against Dr. Carter primarily."[4] Dr. Flye agreed that his criticism of the nursing staff was that they did not report significantly increased BUN and creatinine[5] lab values to Dr. Carter timely and that had they done so, Dr. Carter would have taken MacDonald to surgery earlier, thus saving his life. Dr. Flye opined that MacDonald's bowel probably became totally occluded and therefore necrotic "over the course of the night of

---

[4]Although appellee attached excerpts from Dr. Flye's deposition testimony to its motion, appellants attached the entire deposition to their response.

[5]Creatinine is a component of urine. Stedman's Med. Dictionary 456 (28th ed.). "BUN stands for blood urea nitrogen. Urea nitrogen is what forms when protein breaks down." MedlinePlus Online Medical Encyclopedia, http://www.nlm.nih.gov/medlineplus/ency/article/003474.htm (last visited June 14, 2011).

7

the 25th," i.e., Monday night to early Tuesday morning. As far as MacDonald's survival chances, Dr. Flye testified as follows:

Q. . . . What would you say survival is if we have to operate on and repair in Mr. MacDonald the renal artery and the SMA [superior mesenteric artery] at the same time?

A. Well, it depends upon at what point you operated, because if you have a bowel that's patchy necrosis many times you can get these patients through that because you've got bowel that was left behind or eliminating from the effected source segmentally. So I can't tell you since he was operated on in the afternoon of Tuesday I can't tell you what would have been done at 7:00 or 7:30 that morning. It may have been patchy distribution.

. . . .

Q. If he would have been operated on for renal artery and the SMA on Monday morning, what would his survival have been?

A. Probably more likely than not surviving, but I probably would not have told the family 95 percent survival, probably somewhere in the 50 plus to 80 plus range, and the problem with these individual cases is they're so different one from another that if you take 100 cases like this you'll get a number but the range is such that it might be quite variable.

Q. Each dissection is different?

A. Yes.

He further testified,

Q. . . . To make sure I understand your opinion about Tuesday's labs, the elevation of the creatinine and BUN above what they were earlier in the hospitalization are due this time to infarcted bowel?

A. Well, rather it's a rather dramatic increase in 24 hours, yeah.

Q. Right. And that's due to infarcted bowel?

8

A. Well, the two are close together. I can't tell you whether it's dissection of the renal arteries as well as the SMA, but certainly the events that are precipitating that are what caused occlusion of the blood flow to the bowel.

Dr. Flye testified that even though MacDonald's creatinine and BUN were rising at a slow pace over the course of his treatment, the change the nurses failed to report the day before his death was dramatic. The two symptoms of bowel ischemia exhibited by MacDonald were diarrhea and extreme pain requiring morphine. Dr. Flye opined,

Q. . . . Now, what is it about the increased creatinine and BUN levels that indicates an ischemic bowel?

A. The increase and rise of creatinine in that 24 hour period in view of the CT scan beforehand indicating some compromise and the fact that now the patient is deteriorating. So with the increase in renal dysfunction Dr. Carter is onsite and feels that the patient needs to be explored.

. . . .

A. So it's his clinical impression in view of the increasing rate of deterioration of renal function in arteries that are in proximity to the arteries that would [a]ffect the bowel function.

Dr. Flye also testified that he concluded that the BUN and creatinine results were available to the nurses at 5:15 a.m. but that the records do not show that anyone communicated these results to Dr. Carter until 9:25 a.m. when he made his rounds for the morning; by that time, it was too late for Dr. Carter to arrange for a surgeon because all of the surgeons had started their first surgeries around 7:30 a.m. that morning. Dr. Flye believed that if the nursing staff had

9

notified Dr. Carter before the first round of surgeries had started for the day, MacDonald would have made it into surgery earlier and survived.

According to Dr. Flye, the bowel infarction probably would not cause the sharply increased creatinine and BUN levels, but these results showed impaired kidney function that would result in an infarcted bowel. The results are significant because, according to Dr. Flye,

> Well, it's a response of Dr. Carter. I mean as demonstrated by his immediate response in getting him to surgery, trying to get a general surgeon. In his deposition those numbers were big red flags for him. He didn't write a note and say this is what they are, I'll think about them again tomorrow. I mean he responded . . . ."

Appellee's motion also contended that a Dr. Hull or Hall had indicated in the progress notes, attached to their motion, that he had the creatinine and BUN values at 7:58 a.m. and that he made orders that the nurses followed.[6] Appellee claims this shows that there is a lack of proximate cause and breach of duty because the nurses reported the values to someone. But Dr. Flye testified that he would not expect Dr. Hull to pass along that information because he was focused at that time only on whether MacDonald was a good candidate for dialysis. According to Dr. Flye, the nurses nevertheless still needed to

---

[6]The progress notes are included in the appellate record, but they are largely indecipherable. Regardless, appellants do not dispute appellee's contention that the notes show that a Dr. Hull, or Hall, a cardiologist, knew about MacDonald's creatinine and BUN values at approximately 7:58 a.m. on the 26th, that he gave orders to the nurses, and that the nurses apparently followed those orders.

10

communicate the lab values to Dr. Carter because "[t]he nurses are directly responsible to the attending physician, Dr. Carter, not to Dr. Hull."

Appellants' response indicates that the summary judgment was improper because there is evidence that Dr. Carter would have considered the elevated creatinine level significant and immediately arranged for "a corrective surgical procedure that, in all reasonable medical probability, would have saved Mr. MacDonald's life."

Dr. David Carter, a cardiothoracic surgeon, testified in his deposition that he was concerned about MacDonald's renal output because of how much medicine and dye they had been giving him. He had MacDonald's renal output checked and talked to Dr. Meltzer every day. According to Dr. Carter, ischemia in particular was something he looked for every day.[7] However, he could not remember finding out that the nurses had failed to report something to him that he would have considered significant. Dr. Carter thought they were "winning the battle" on the 25th because although MacDonald's creatinine levels had been going up, his urine output was good; however, on the morning of the 26th, Dr. Carter was for the first time, "absolutely, positively sure [they] had lost the battle." He was not sure about MacDonald's condition on the night of the 25th and early morning of the 26th, but when he walked in on the 26th, looked at MacDonald, and the nurses gave him their report, "that was the first time [he] was sure." Dr.

---

[7]Dr. Carter explained that ischemia is a lack of blood flow, as opposed to an infarct, which is lack of blood flow severe enough to cause tissue death.

11

Carter did not even order another study at that time; he ordered the operating room to get ready. Dr. Carter could not opine as to when there was at least a fifty-one percent chance of saving MacDonald.

Dr. Carter explained that surgery is not always indicated when a dissection involves the kidneys or gut because they could recover instead of becoming ischemic. He decided to treat MacDonald conservatively because it appeared that the kidneys had some damage due to emboli rather than lack of blood flow, but he explained that Dr. Meltzer felt that the creatinine level "was going up but . . . at a pace that didn't indicate renal death." Dr. Meltzer initially thought the kidneys would recover. When Dr. Carter was asked whether the kidney function impacted how he viewed the potential for small bowel ischemia, Dr. Carter said, "We're going to base some of that on how we feel about the kidneys in the sense of is the kidney disease progressive, do we think it's getting worse, do we think it's going south. That's going to impact how we think about the big picture, yes." When asked if he had an opinion as to whether the kidneys were completely infarcted by Tuesday, Dr. Carter answered, "Based on the rapid increase in BUN and creatinine in six hours, I would say, yes." Dr. Carter speculated that the bowel died before the kidneys, but he said it was just his interpretation of what had happened.

Appellants attached to their response Dr. Carter's answers to interrogatories in which he stated that he did not dispute the times listed in the nursing records, i.e., that he saw MacDonald for the first time at 9:25 a.m. on the

12

26th, and he does not recall that anyone called him about the lab values, nor does the chart reflect that anyone did. He also answered that sometime between 9:30 and 10:30 a.m. on the 26th, he and the other physicians felt like MacDonald had suffered from necrotic bowel and nothing could be done to save him.

**Analysis**

Appellee contends that it conclusively proved a lack of causation because appellants cannot prove that MacDonald's chance of survival was greater than fifty percent. However, appellee did not move for summary judgment on this ground; thus, it would not have been proper for the trial court to grant summary judgment on this ground. *See State Farm Lloyds v. Page*, 315 S.W.3d 525, 532 (Tex. 2010); *Timpte Indus.*, 286 S.W.3d at 310.

Appellee additionally contends that the summary judgment was proper because appellants cannot show that Dr. Carter would have altered his treatment of MacDonald based on the lab results in that MacDonald showed other evidence of ischemia that Dr. Carter chose not to act on. It further contends that Dr. Meltzer's testimony that he would not have expected the results to catch the nurses' eyes conclusively proves the lack of a deviation from the standard of care. Appellee relies heavily on the fact that Dr. Carter did not say he would have ordered MacDonald immediately into surgery had he received the BUN and

13

creatinine values earlier on the morning of September 26th to show that it conclusively proved a lack of causation.[8]

Dr. Carter's deposition testimony shows that the kidneys were probably infarcted by Tuesday morning based on the marked increased in the BUN and creatinine levels. Although appellee contends that there is no evidence those increased levels would have been significant to Dr. Carter at 5:15 a.m.[9] as opposed to 9:25 a.m., Dr. Carter testified that he "ordered the operating room to get ready" as soon as he saw MacDonald at 9:25 a.m. *and* got the nurses' report. What Dr. Carter actually did upon receiving those results is at least some probative evidence of what he would have done if he had received those results earlier, especially in light of the fact that appellee did not present any evidence of an intervening, significant change in MacDonald's condition between the time the results were reported to the nurses and the time the nurses reported the results

---

[8]Appellee also says that Dr. Flye merely speculated that the hospital's surgery rotations began around 7:00 or 7:30 a.m. and that if the nurses had let Dr. Carter know earlier, he would have been able to get a surgeon to operate on MacDonald earlier. But Dr. Flye testified that the depositions and medical records he had reviewed showed that when Dr. Carter tried to get a surgeon, Dr. Purgett, to operate, he was already in the middle of another surgery that had started earlier and could not stop; MacDonald's surgery had to wait five hours until Dr. Purgett was finished. Dr. Flye also testified that in his experience hospitals generally begin the first rotation of surgeries around 7:30 a.m. Although appellee may disagree with this evidence, it is nonetheless evidence that had the nurses given Dr. Carter the information earlier, he would have been able to order surgery before Dr. Purgett had begun a different surgery.

[9]Appellee did not present any evidence contradicting Dr. Flye's testimony that he believed the results came back from the lab around this time based on other deposition testimony he had read.

14

to Dr. Carter. Moreover, the fact that a Dr. Hull or Hall may have made orders based on the BUN and creatinine results in the early morning of the 26th, or that Dr. Meltzer did not think the nurses would have found those levels significant, does not change what Dr. Carter, MacDonald's primary physician, actually did when he finally received those values, nor does it change Dr. Flye's opinion testimony that the nurses should have appreciated the significance of the change in those values and reported them immediately to Dr. Carter.

We conclude that the evidence does raise a fact issue sufficient to defeat a traditional motion for summary judgment; thus, we conclude and hold that the trial court erred by granting appellee's traditional motion for summary judgment on appellants' claims that the nurses' negligent failure to timely report MacDonald's BUN and creatinine levels to Dr. Carter was a proximate cause of MacDonald's death.[10] We sustain appellants' first issue.

### No-Evidence Motion for Summary Judgment

Appellee contended in its no-evidence motion for summary judgment that appellants did not present any expert evidence of proximate cause on their new claim that the nurses failed to timely notify Dr. Carter that MacDonald was experiencing tachypnea on the night of the 25th and early morning of the 26th. In their response to appellee's motion, appellants attached Dr. Flye's deposition and a new affidavit from Dr. Flye. Appellee objected to the affidavit, claiming it

---

[10]There may be more than one proximate cause of an event. *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 774 (Tex. 2010).

15

was speculative and conclusory; however, the trial court denied appellee's objections to the affidavit.

The affidavit states that tachypnea and evidence of metabolic acidosis are symptoms of end-organ ischemia. According to Dr. Flye's affidavit, MacDonald "began to exhibit evidence of sustained tachypnea" on the evening of Monday, September 25, 2006. Dr. Flye averred that

> [a]pparently, the nurses did not contact Dr. Carter or any other physician about this new finding. Had Dr. Carter been provided this information on Monday evening, it is more likely than not that he would have further investigated the problem and discovered the need for immediate surgical correction of the dissection along with revascularization of the small bowel. Arterial blood gases would have revealed metabolic acidosis. Dr. Carter would likely have arranged for emergent abdominal exploration just as he eventually did in reality on the following day. . . .

> . . . Had Dr. Carter known of the patient's metabolic acidosis in time on Tuesday morning, he could have arranged for Mr. MacDonald to undergo an exploration in the 7:30 a.m. surgical schedule at this particular hospital on September 26, 2006. Had this occurred, I believe it is more likely than not that Mr. MacDonald's aorta could have been sufficiently repaired so as to re-establish blood flow through the superior mesenteric artery. This would have saved the small bowel. . . .

**Applicable Law**

The relevant standard for an expert's affidavit opposing a motion for summary judgment is whether it presents some probative evidence of the facts at issue. *Ryland Group, Inc. v. Hood*, 924 S.W.2d 120, 122 (Tex. 1996). Conclusory affidavits are not enough to raise fact issues because they are not credible, nor are they susceptible to being readily controverted. *Id.*; *see* Tex. R. Civ. P. 166a(c). To be reliable, expert testimony must be grounded in the methods and procedures of science and be more than subjective belief or

16

unsupported speculation. *Kerr-McGee Corp. v. Helton*, 133 S.W.3d 245, 254 (Tex. 2004); *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 726, (Tex. 1998).

**Analysis**

Dr. Flye's affidavit testimony is similar to the affidavit and deposition testimony in *Benitz v. Gould Group*, 27 S.W.3d 109, 114–16 (Tex. App.—San Antonio 2000, no pet.), and *Bottoms v. Smith*, 923 S.W.2d 247, 251–52 (Tex. App.—Houston [14th Dist.] 1996, no writ). In both of those cases, qualified experts offered testimony that if certain tests had been performed, those tests would have revealed significant information that doctors would have acted on and that would have increased the decedents' chances of survival. *Benitz*, 27 S.W.3d at 114–16; *Bottoms*, 923 S.W.2d at 251–52. Such evidence was not conclusory nor did it constitute impermissible inference stacking; it represented a "series of probabilities" based on the experts' medical experience that raised fact issues sufficient to defeat summary judgment motions. *Benitz*, 27 S.W.3d at 115.

Here, Dr. Flye is a vascular surgeon with experience in treating aortic dissections. He averred in his affidavit—based on his personal experience and the experience of colleagues, and his review of the medical records and depositions in this case—that (1) MacDonald began exhibiting tachypnea on Monday evening, September 25, 2006, (2) tachypnea is a symptom of end-organ ischemia, (3) the nurses failed to report this symptom to Dr. Carter on Monday evening when it began, (4) had Dr. Carter been so informed he would have ordered a test to confirm acidosis, (5) acidosis would have been revealed in such a test because MacDonald was, in fact, ischemic and infarcting at or around that time, and (6) that Dr. Carter would have had time to arrange for surgery before

17

the 7:30 a.m. rotations began, thus saving MacDonald's life. This testimony is not conclusory, nor is it so speculative as to result in impermissible inference stacking that it would prevent appellee from being able to controvert it at trial. *See Ryland*, 924 S.W.2d at 122; *Souder v. Cannon*, 235 S.W.3d 841, 849 (Tex. App.—Fort Worth 2007, no pet.); *Benitz*, 27 S.W.3d at 115–16.

This evidence is likewise sufficient to raise a fact issue on appellants' allegations about the tachypnea; thus, the trial court erred by granting appellee's no-evidence summary judgment as to this claim. *See Benitz*, 27 S.W.3d at 115–16. We sustain appellants' second issue.

## Conclusion

Having sustained both of appellants' issues, we reverse the trial court's judgment and remand this case to the trial court.

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL:  LIVINGSTON, C.J.; GARDNER and WALKER, JJ.

DELIVERED: July 7, 2011

18