

# COURT OF APPEALS

**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

## NO. 02-11-00060-CV

AMOS MCALISTER A/K/A A.L.
MCALISTER, INDIVIDUALLY AND
D/B/A ALBAM INVESTMENTS AND
BARBARA MCALISTER,
INDIVIDUALLY AND D/B/A ALBAM
INVESTMENTS

APPELLANTS

V.

HATBREEZE PROPERTIES, L.L.C.

APPELLEE

----------

FROM THE 141ST DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

Appellants Amos McAlister and Barbara McAlister (together, the McAlisters), individually and doing business as Albam Investments, appeal the trial court's judgment awarding appellee Hatbreeze Properties, L.L.C. damages

---

[1]*See* Tex. R. App. P. 47.4.

for the McAlisters' breach of their commercial lease.  We will modify the trial court's judgment and affirm it as modified.

## Background Facts

In April 2008, the McAlisters entered into a five-year commercial lease agreement with Hatbreeze for an industrial property.  The monthly rent under the lease was $3,500.[2]  The McAlisters paid the rent until January 2009.[3]  In a letter dated March 3, 2009, the McAlisters stated that they learned that Hatbreeze's insurance company was cancelling "the insurance on the building" and that they were concerned "as to whether [their] liability and worker's comp would be valid if there [were] no insurance on the building."  The letter concluded, "Therefore, to alleviate this situation, I am moving the cabinet shop from this premises.  I will be vacating your building asap."

In January 2010, Hatbreeze sent a formal demand letter to the McAlisters requesting $192,000, exclusive of attorneys' fees and other expenses.  The letter stated, "Pursuant to Section 11.02 D of the Lease, [Hatbreeze] has hereby opted to accelerate the unpaid rent for the full term of the Lease. . . .  The lease also entitles [Hatbreeze] to collect 5% interest on this amount as a Late Charge."  The McAlisters did not respond.  In February 2010, Hatbreeze sued the McAlisters for

---

[2]The parties agreed to a reduced rent for three months at the beginning of the lease so that the total amount of rent to be paid over five years was $204,750.

[3]The total amount of rent the McAlisters paid from May 2008 to January 2009 was $26,250.

breach of contract and sought damages "consistent with the terms of the Lease providing for acceleration, interest[,] and a security lien." Hatbreeze alleged that its damages were $178,500 in unpaid rent plus $8,925 in interest, attorneys' fees, and court costs.

The McAlisters answered and asserted that Hatbreeze had breached the lease by failing to renew the insurance on the property in January 2009 and that Hatbreeze had failed to mitigate its damages. The McAlisters also filed counterclaims for breach of contract, fraud, and fraudulent inducement. Hatbreeze filed a traditional and no-evidence motion for summary judgment on its claim against the McAlisters and on the McAlisters' counterclaims. No order on the summary judgment motion appears in the record, but the final judgment provides that the trial court granted the motion in September 2010 as to Hatbreeze's claim and as to the McAlisters' counterclaims, defenses, and affirmative defenses.

Hatbreeze relet the property in October 2010 for $3,400 per month, which is $100 per month less than the McAlisters' rent under their lease. Hatbreeze filed a supplemental petition noting the new tenant and lease terms, and praying for damages in pursuit of reletting the property. A trial to the bench was held on the matter of damages, and the trial court awarded Hatbreeze damages of $95,332.68, attorneys' fees, court costs, and prejudgment interest. This appeal followed.

**Discussion**

We address the McAlisters' fourth through ninth issues first, as those challenge the summary judgment, are potentially dispositive, and afford the greatest relief. *See* Tex. R. App. P. 47.1; *see generally VanDevender v. Woods*, 222 S.W.3d 430, 433 n.9 (Tex. 2007); *West v. Robinson*, 180 S.W.3d 575, 576–77 (Tex. 2005).

## I. Summary judgment

Hatbreeze moved for traditional summary judgment on its breach of contract claim. It moved for no-evidence summary judgment on the McAlisters' defenses of failure to mitigate and discharge and on their counterclaim for breach of contract.[4] Hatbreeze moved for summary judgment on the McAlisters' counterclaims of fraud and fraudulent inducement on both traditional and no-evidence grounds.

We review a summary judgment de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). After an adequate time for discovery, the party without the burden of proof may, without presenting evidence, move for summary judgment on the ground that there is no evidence to support an essential element of the nonmovant's claim or defense. Tex. R. Civ. P. 166a(i). The motion must specifically state the elements for which there is no evidence. *Id.*; *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009). The trial court

---

[4]The McAlisters did not assign error to the summary judgment on their defense of failure to mitigate.

must grant the motion unless the nonmovant produces summary judgment evidence that raises a genuine issue of material fact. *See* Tex. R. Civ. P. 166a(i) & cmt.; *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008). We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008). A plaintiff is entitled to summary judgment on a cause of action if it conclusively proves all essential elements of the claim. *See* Tex. R. Civ. P. 166a(a), (c); *MMP, Ltd. v. Jones*, 710 S.W.2d 59, 60 (Tex. 1986). A plaintiff who conclusively negates at least one essential element of a cross-claim is entitled to summary judgment on that claim. *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010); *see* Tex. R. Civ. P. 166a(b), (c).

When reviewing a no-evidence summary judgment, we examine the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion. *Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006). We review a no-evidence summary judgment for evidence that would enable reasonable and fair-minded jurors to differ in their conclusions. *Hamilton*, 249 S.W.3d at 426 (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005)). We credit evidence favorable to the nonmovant if

5

reasonable jurors could, and we disregard evidence contrary to the nonmovant unless reasonable jurors could not. *Timpte Indus.*, 286 S.W.3d at 310 (quoting *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006)). If the nonmovant brings forward more than a scintilla of probative evidence that raises a genuine issue of material fact, then a no-evidence summary judgment is not proper. *Smith v. O'Donnell*, 288 S.W.3d 417, 424 (Tex. 2009); *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003), *cert. denied*, 541 U.S. 1030 (2004). When a party moves for summary judgment under both rules 166a(c) and 166a(i), we will first review the trial court's judgment under the standards of rule 166a(i). *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). If the appellant failed to produce more than a scintilla of evidence under that burden, then there is no need to analyze whether the appellee's summary judgment proof satisfied the less stringent rule 166a(c) burden. *Id*.

## A. Insurance

The McAlisters' fourth, seventh, eighth, and ninth issues involve the question of whether Hatbreeze was required by the lease to maintain insurance on the property, and if so, whether Hatbreeze maintained the insurance as required.

In their eighth and ninth issues, the McAlisters complain that the trial court erred in granting traditional summary judgment on Hatbreeze's claim for breach of contract because a genuine issue of material fact existed regarding whether Hatbreeze performed under the lease. Specifically, the McAlisters challenge the

6

trial court's findings that the lease requirement that Hatbreeze have insurance was immaterial or a mutually dependent term. In their seventh issue, the McAlisters challenge the no-evidence summary judgment on their affirmative defense of discharge, arguing that Hatbreeze's failure to maintain insurance on the property discharged their duty to perform under the contract. In their fourth issue, the McAlisters challenge the no-evidence summary judgment on their claim for breach of contract because Hatbreeze failed to maintain insurance as required by the lease.

In order to recover on its breach of contract case, Hatbreeze was required to show (1) the existence of the lease; (2) its compliance with the terms of the lease; and (3) the breach of the lease by the McAlisters. *See McGraw v. Brown Realty Co.*, 195 S.W.3d 271, 276 (Tex. App.—Dallas 2006, no pet.); *Bieganowski v. El Paso Med. Ctr. Joint Venture*, 848 S.W.2d 361, 362 (Tex. App.—El Paso 1993, writ denied). The McAlisters argued that Hatbreeze did not comply with the section of the lease that required it to maintain insurance on the property. Hatbreeze's alleged breach of contract, they argued, defeats summary judgment on Hatbreeze's breach of contract claim, the McAlisters' affirmative defense of discharge, and their counterclaim for breach of contract.

Only a material breach by a party to an agreement will excuse the performance of the other contracting party. *See Hernandez v. Gulf Group Lloyds*, 875 S.W.2d 691, 692 (Tex. 1994). In determining the materiality of a breach, courts consider, among other factors, the extent to which the

7

nonbreaching party is deprived of the benefit it could have reasonably expected from the other party's full performance. *Id.* at 693. The less the nonbreaching party is deprived of its expected benefit, the less material the breach. *Id.* It follows that if there is no evidence of an expected benefit to the nonbreaching party, there is no evidence of the materiality of the breach. While materiality of a breach is normally a question of fact, if there is no evidence to raise a question of fact, the court may grant summary judgment as a matter of law. *See* Tex. R. Civ. P. 166a(c); *Frost Nat'l Bank*, 315 S.W.3d at 508.

Section 5.01 of the lease states,

> During the Term, Landlord shall maintain policies of insurance covering loss of or damage to the Premises in an amount or percentage of replacement value as Landlord deems reasonable . . . . The policies will provide protection against all perils that Landlord reasonably deems necessary. Landlord may, at Landlord's option, obtain insurance coverage for Tenant's fixtures, equipment[,] or building improvements installed by Tenant in or on the Premises. Tenant shall, at Tenant's expense, maintain insurance on Tenant's fixtures, equipment[,] and building improvements as Tenant deems necessary to protect Tenant's interest. . . . Any property insurance carried by Landlord or Tenant shall be for the sole benefit of the party carrying the insurance and under its sole control.

The lease's plain language states that any insurance on the property carried by Hatbreeze was for the sole benefit of Hatbreeze, not the McAlisters. The McAlisters argue that they provided evidence that Hatbreeze told them that its insurance had lapsed and thus, the McAlisters argue, they have demonstrated that a genuine issue exists as to whether Hatbreeze violated terms of the lease. However, the McAlisters have not provided any evidence of a benefit they would

8

have received by Hatbreeze maintaining property insurance for its "sole benefit." Without a benefit to the McAlisters, any breach by Hatbreeze of the insurance provisions cannot be deemed material.

There is no evidence that Hatbreeze was required to maintain insurance for the McAlisters' benefit. Thus, there is no evidence that Hatbreeze failed to perform under the contract so as to discharge the McAlisters from paying rent. Summary judgment was therefore proper on the McAlisters' discharge defense and their counterclaim for breach of contract. Hatbreeze demonstrated that it did not materially breach the lease by failing to provide insurance on the property so summary judgment was also proper on Hatbreeze's claim for breach of contract because there is no genuine issue as to whether Hatbreeze performed under the contract, and the McAlisters did not challenge any other element of Hatbreeze's cause of action. We overrule the McAlisters' fourth, seventh, eighth, and ninth issues.

## B. Fraud and fraudulent inducement

In their fifth and sixth issues, the McAlisters challenge the summary judgment on their counterclaims for fraud and fraudulent inducement. Hatbreeze moved for summary judgment on the McAlisters' counterclaims of fraud and fraudulent inducement on both traditional and no-evidence grounds. Thus, we will review the trial court's judgment under the no-evidence standards first to determine if the McAlisters produced a scintilla of evidence to support their claims. *See Ford Motor Co.*, 135 S.W.3d at 600.

9

The elements of fraud are: (1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011). With a fraudulent inducement claim, the elements of fraud must be established as they relate to an agreement between the parties. *Haase v. Glazner*, 62 S.W.3d 795, 798–99 (Tex. 2001).

In their petition, the only injury that the McAlisters claimed as a result of Hatbreeze's alleged common law fraud was the cost of moving the business from the property, a cost of $106,114. However, the McAlisters have repeatedly asserted that the reason they vacated the premises was their belief that Hatbreeze's insurance had been cancelled. As Amos McAlister stated in his affidavit,

> I vacated the building based upon the representations by Hatbreeze regarding the insurance. This reliance was made clear in my letter dated March 3, 2009, which was never responded to. Had they informed me that the insurance was still on the property, I would have continued to work with them to remedy the other defects on the property rather than vacating.

But the McAlisters' claim for fraud, as alleged in their live petition, is based on alleged misrepresentations concerning the age and structural condition of the

10

roof, not misrepresentations about insurance. The summary judgment evidence that the McAlisters direct us to in support of the assertion of error deal only with the issue of the roof. Amos McAlister's own affidavit defeats their argument. The undisputed evidence shows that the McAlisters did not vacate the building due to misrepresentations concerning the roof but instead because Hatbreeze purportedly let the insurance lapse. There is no evidence that the sole injury of which the McAlisters complain was caused by misrepresentations regarding the roof. The McAlisters have not presented any evidence of injury associated with the alleged fraud. Thus, the trial court did not err in granting summary judgment on their fraud claim.

As to their fraudulent inducement claim, the McAlisters argue that Hatbreeze made two fraudulent statements: one, that the building had a new roof; and two, that the building had only been used for storage. However, the only damages that the McAlisters allege were that materials stored in the building were damaged "[d]ue to the leaking." The McAlisters alleged no injury resulting from the alleged fraudulent statement that the building had only been used for storage, nor did they present any evidence that the building's use for purposes other than storage caused them injury. Thus, there is no evidence as to damages caused by the second alleged fraudulent statement and the trial court did not err in granting summary judgment on that claim.

As to the first alleged fraudulent statement—that the building had a new roof—the only evidence the McAlisters presented as to the falsity of the

11

statement was evidence that the roof leaked. The building on the property consisted of two parts: a concrete industrial office building and a steel structure with a loading dock. The evidence showed that the main building had been reroofed in 2007 and that the steel structure "had been overlaid with a clear roofing material at the same time the new roof was put on the concrete building in 2007." However, an "after[-]installed air conditioning unit with tubing [was] installed into the surface of the roof. This tubing was not installed correctly and caused a minor leak in the Building." Also, the steel structure "was structurally unsound. Any time the wind would blow, the building would shift and the sealants would crack, resulting in leaks."

Thus, the evidence was either that a poorly installed air conditioning unit or a poor reroofing job caused the leaking in the main building, not that it was not actually reroofed. The evidence also showed that it was either a poor reroofing job on the steel structure or its state of deterioration that led to the leaking in the steel building, not that it was not reroofed. And although Amos McAlister states in his affidavit that he had been assured that the steel structure was "watertight," he did not plead that the statements regarding the watertightness of the building were fraudulent. In short, the McAlisters did not plead what they had evidence of, and they did not provide evidence on what they pleaded. Thus, the trial court did not err in granting summary judgment on their claim for fraudulent inducement.

We overrule the McAlister's fifth issue. Because we overrule their fifth issue, we do not reach their sixth issue regarding the validity of the fraudulent inducement waiver. *See* Tex. R. App. P. 47.1.

## II. Damages and attorney's fees

The McAlisters' first through third issues complain of the measure of damages used by the trial court. Their tenth through thirteenth issues complain of the amount of damages and attorney's fees awarded. The trial court awarded Hatbreeze $95,332.68 in actual damages. The trial court made the following findings of fact relevant to the damages award:

> 8.  As of the date of the Judgment, Defendants failed to pay twenty months of rent for a total of $70,000 before Plaintiff was able to lease the Property to another tenant in October of 2010. There were thirty (30) months left on the Lease Agreement in October 2010.

> 9.  Pursuant to Section 3.03 of the Lease Agreement, a five percent (5%) late fee may be imposed upon Defendants for failure to pay rent. Five percent (5%) of $70,000.00 is $3,500.00.

> 10.  Plaintiff entered into a lease agreement with a new tenant who began paying rent in October of 2010 at the rate of $3,400.00 per month. The difference in rent between Defendants' Lease Agreement and the new tenant's lease agreement is $100.00 per month. The present value of the difference in rent between Defendants and the new tenant is $2,922.50.

> 11.  Pursuant to 11.02 of the Lease Agreement, Plaintiff was entitled to declare rent and other items due under the Lease Agreement once Defendants breached the Lease Agreement. Also therein, Plaintiff could relet the premises in which case Defendants would be liable for any deficiency that may arise by reason of any such reletting including professional service fees, reasonable attorneys['] fees, court costs, remodeling expenses[,] and other costs of reletting.

13

12. Pursuant to Section 7.03B of the Lease Agreement, Defendants were responsible for maintenance and repair of the Property and the HVAC units. . . .

. . . .

15. Between the period in which Defendants vacated the property and a new tenant was obligated under a lease, Plaintiff incurred $3,530.00 for electrical bills.

16. Between the period in which Defendants vacated the property and a new tenant was obligated under a lease, Plaintiff incurred $2,699.53 for the City of Fort Worth water, trash[,] and sewer.

17. Between the period in which Defendants vacated the property and a new tenant was obligated under a lease, Plaintiff incurred $3,097.00 for yard cleanup and other handy man services.

18. Between the period in which Defendants vacated the property and a new tenant was obligated under a lease, Plaintiff incurred $349.65 for air conditioning maintenance.

19. Between the period in which Defendants vacated the property and a new tenant was obligated under a lease, Plaintiff incurred $1,200.00 for remodeling bills.

20. Between the period in which Defendants vacated the property and a new tenant was obligated under a lease, Plaintiff incurred $8,024.00 for realtor commission.

## A. The measure of damages

In their first issue, the McAlisters argue that the damage provisions of the contract were unenforceable penalties. The McAlisters rely on *Stewart v. Basey*, 245 S.W.2d 484, 487 (Tex. 1952), for its holding that when a contract provides the same reparation for the breach of a trivial stipulation as for the breach of an important one, the damages are not just compensation and the provision is a

penalty. The McAlisters argue that because their failure to comply "with any term, condition[,] or covenant" of the lease is considered a default and could result in the same remedies as would their failure to pay rent, the remedies provision is an unenforceable penalty.

We first note that under the lease's terms, the stipulation that a failure to comply "with any term, condition[,] or covenant" of the lease did not rise to a default until the McAlisters continued that failure "for a period of thirty (30) days after Landlord deliver[ed] written notice of the failure to Tenant."[5] Thus, the McAlisters could not have defaulted by simply failing to maintain the yard or HVAC system, but only if they persisted in violating the contract for the stated period after receiving written notice of their violation.

Second, the McAlisters did not bring forth evidence that the stipulated damages were unreasonable. *See SP Terrace, L.P. v. Meritage Homes of Tex., LLC*, 334 S.W.3d 275, 287 (Tex. App.—Houston [1st Dist.] 2010, no pet.); *Urban Television Network Corp. v. Liquidity Solutions*, 277 S.W.3d 917, 919 (Tex. App.—Dallas 2009, no pet.) (noting that it is the defendant's burden to demonstrate the unreasonableness of a liquidated damages clause). The trial court awarded Hatbreeze damages under the contract provision allowing Hatbreeze to relet the premises and receive the deficiency from the McAlisters.

---

[5]Section 11.01(A) of the lease, on the other hand, provides for a default based on a failure to pay rent when the failure continues for five days after Hatbreeze delivers notice of the failure.

While the property was empty, the deficiency was the full amount of rent. After it was relet, the deficiency was $100 per month, plus the costs of reletting. This is the amount that the trial court awarded Hatbreeze, plus its costs for utilities and maintenance of the property. Additionally, the McAlisters stated in their response to Hatbreeze's motion for summary judgment on damages that this was the correct measure of damages. Because we hold that the trial court was correct in calculating damages pursuant to the damages provision of the contract, we overrule the McAlisters' first issue, and we do not reach their third issue. *See* Tex. R. App. P. 47.1.

In their second issue, the McAlisters argue that the trial court erred by finding that Hatbreeze never used the property for its own purposes. The McAlisters do not explain how this finding bears on the damages awarded by the trial court. To the extent that the McAlisters argue that Hatbreeze's use of the property should reduce the damages they were required to pay, we note that it was the McAlisters' burden to show the amount of reduction. *See Austin Hill Country Realty, Inc. v. Palisades Plaza, Inc.*, 948 S.W.2d 293, 299 (Tex. 1997). Although there was evidence that Hatbreeze stored some items in a portion of the building while it was without a tenant, there was no evidence of what amount the damages should be reduced because of it. We overrule the McAlisters' second issue.

## B. Attorneys' fees and the amount of damages

### 1. Excessive demand

In their twelfth issue, the McAlisters argue that the trial court erred by granting Hatbreeze attorneys' fees because Hatbreeze's initial demand was excessive.

A creditor who makes an excessive demand upon a debtor is not entitled to attorney's fees for subsequent litigation required to recover the debt. *Findlay v. Cave*, 611 S.W.2d 57, 58 (Tex. 1981). Application of this rule is limited to situations where the creditor refuses a tender of the amount actually due or indicates clearly to the debtor that such a tender would be refused. *Id.*; *Hernandez v. Lautensack*, 201 S.W.3d 771, 777 (Tex. App.—Fort Worth 2006, pet. denied). A demand letter that states that the full demand amount must be tendered indicates a refusal to accept tender of a lesser amount. *Aero DFW, LP v. Swanson*, No. 02-06-00179-CV, 2007 WL 704911, at *4 (Tex. App.—Fort Worth Mar. 8, 2007, no pet.) (mem. op.); *Warrior Constructors, Inc. v. Small Bus. Inv. Co. of Houston*, 536 S.W.2d 382, 386 (Tex. Civ. App.—Houston [14th Dist.] 1976, no writ).

The initial demand letter to the McAlisters sought $192,000 in damages, stating,

> [T]his letter shall serve as a demand that you make arrangements to pay the full amount of $192,000.00 plus attorney's fees of $2,500.00 for handling this matter within thirty (30) days of this letter. In the event you fail to pay the amount, my client will be forced to file suit against you . . . for breach of contract.

17

At the time of the demand, fifty months remained on the McAlisters' lease. Multiplied by their monthly rent of $3,500, the McAlisters would have owed only $175,000—$17,000 less than Hatbreeze's demand. Hatbreeze never offered any explanation as to the $17,000 difference.

The McAlisters did not respond to the demand letter. However, the language requiring the McAlisters to pay the full $192,000 or else Hatbreeze would file suit indicates Hatbreeze's unwillingness to accept the actual amount due. *See Aero DFW*, 2007 WL 704911, at *4; *Warrior Constructors*, 536 S.W.2d at 386; *Hernandez*, 201 S.W.3d at 777. Thus, the McAlisters were not required to respond in order to demonstrate Hatbreeze's refusal to accept tender of a lesser amount. Hatbreeze's demand exceeded the total accelerated rent and there was no evidence that they were entitled to the extra $17,000. Because the demand was excessive and the demand letter indicated a clear intent to refuse the amount actually due to them, Hatbreeze is not entitled to attorney's fees in this case. *See Findlay*, 611 S.W.2d at 58; *Aero DFW*, 2007 WL 704911, at *4. We sustain the McAlisters' twelfth issue.

### 2. Utilities and property maintenance costs

In their eleventh issue, the McAlisters argue that the trial court erred by allowing Hatbreeze to recover on its claims for utilities and property maintenance because Hatbreeze did not provide notice as required by the lease. Hatbreeze added a demand for utilities and maintenance in its first supplemental petition.

18

The McAlisters rely on section 11.01 of the lease for their assertion that Hatbreeze was required to deliver written notice to them of their failure to pay the utilities and maintenance. Section 11.01 states, in part,

Each of the following events is an event of default under the Lease:

A. Failure of Tenant to pay any installment of the Rent or other sum payable to Landlord under this Lease on the date that it is due and the continuance of that failure for a period of five (5) days after Landlord delivers written notice of the failure to Tenant. . . .

B. Failure of Tenant to comply with any term, condition[,] or covenant of this Lease, other than the payment of Rent or other sum of money, and the continuance of that failure for a period of thirty (30) days after Landlord delivers written notice of the failure to Tenant.

. . . .

F. Vacancy or abandonment by Tenant of any substantial portion of the Premises or cessation of the use of the Premises for the purpose leased.

Section 11.02 states,

Upon the occurrence of any of the events of default listed in Section 11.01, Landlord may pursue any one or more of the following remedies without any prior notice or demand.

A. Terminate this Lease . . . . Tenant shall pay to Landlord on demand the amount of all loss and damage that Landlord may suffer by reason of the termination, whether through inability to relet the Premises on satisfactory terms or otherwise.

B. Enter upon and take possession of the Premises, without terminating this Lease . . . . Landlord may relet the Premises and receive the rent therefor. Tenant agrees to pay Landlord monthly or on demand from time to time any deficiency that may arise by reason of any such reletting. In determining the amount of the deficiency, the professional services fees, reasonable attorneys' fees, court costs, remodeling expenses[,] and other costs of reletting

will be subtracted from the amount of rent received under the reletting.

C.    Enter upon the Premises, without terminating this Lease and without being liable for prosecution or for any claim for damages, and do whatever Tenant is obligated to do under the terms of this Lease.  Tenant agrees to pay Landlord on demand for expenses that Landlord may incur in thus effecting compliance with Tenant's obligations under this Lease, together with interest thereon at the rate of twelve percent (12%) per annum from the date expended until paid. . . .

D.    Accelerate and declare the Rent for the entire Term, and all other amounts due under this Lease, at once due and payable, and proceed by attachment, suit[,] or otherwise, to collect all amounts in the same manner as if all such amounts due or to become due during the entire Term were payable in advance by the terms of this Lease, and neither the enforcement or collection by Landlord of those amounts nor the payment by Tenant of those amounts will constitute a waiver by Landlord of any breach, existing or in the future, of any of the terms or provisions of this Lease by Tenant or a waiver of any rights or remedies that Landlord may have with respect to any breach.

. . . .

G. Nothing in this Lease will be construed as imposing any duty upon Landlord to relet the Premises.  Except as required by applicable law, Landlord will have no duty to mitigate or minimize Landlord's damages by virtue of Tenant's default.  Any duty imposed by law on Landlord to mitigate damages after a default by Tenant under this Lease will be satisfied in full if Landlord undertakes to lease the Premises to another tenant (a "Substitute Tenant") . . . .

The McAlisters defaulted on the lease under subsection (A) of section 11.01 by failing to pay rent and under subsection (F) by vacating the property. Hatbreeze did not contend that the McAlisters defaulted under subsection (B). Once the McAlisters defaulted, Hatbreeze could pursue, *without notice*, any of the remedies listed in section 11.02.  Subsection (C) of that section includes

"do[ing] whatever Tenant is obligated to do under the terms of this Lease." The McAlisters have not challenged the trial court's findings that they were responsible under the lease "for maintenance and repair of the Property and the HVAC units" and "for all utility costs." *See McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986) (stating that unchallenged findings of fact "are binding on an appellate court unless the contrary is established as a matter of law, or if there is no evidence to support the finding"). Thus, the contract allowed Hatbreeze to seek reimbursement for utility and maintenance costs without notice once the McAlisters defaulted by failing to pay rent and vacating the property. The trial court did not err in allowing Hatbreeze to recover those costs and we overrule the McAlisters' eleventh issue.

### 3. The security deposit

In their tenth issue, the McAlisters challenge the trial court's refusal to credit their $3,500 security deposit to the amount owed. At trial, Marcus Johnson, president of Hatbreeze, testified that the McAlisters had paid a security deposit as required by the contract. The contract also allowed Hatbreeze to apply the security deposit to "any unpaid Rent or other charges due from Tenant or to cure any other defaults of Tenant." *See* Tex. Prop. Code Ann. § 93.006(a) (West 2007) (allowing the landlord to deduct from the deposit charges for which the tenant is liable). Johnson testified that he had not credited the security deposit to the amount owed. Hatbreeze did not provide any evidence that the deposit had been spent, nor did it provide any reason why the deposit should be

21

forfeited. This evidence establishes the McAlisters' right to a credit in the amount of the deposit, and the trial court's failure to credit the deposit is contrary to the evidence. *See Thrift v. Johnson*, 561 S.W.2d 864, 869 (Tex. Civ. App.—Houston [1st Dist.] 1977) (holding that a lease provision allowing for the forfeiture of a security deposit as well as the pursuit of a cause of action for damages was an unenforceable penalty clause). We sustain the McAlisters' tenth issue.

### 4. Utilities paid by third parties

In their thirteenth issue, the McAlisters claim that the trial court erred in awarding Hatbreeze the utilities that were paid by third parties. At trial, Johnson testified that Hatbreeze allowed a band to practice on the property in October 2009 and that the band mowed the lawn and paid the electricity while they were there. He said,

> [P]art of our arrangement with them was that they paid for—while they were there, they paid for their electricity.
>
> Q. Has that amount been reduced out of what you're seeking today?
>
> A. It should have been. I mean, I assume so. . . . If not, it was an oversight of a couple of hundred dollars.

Dave Tanner, another principal of Hatbreeze, testified that that the band "paid one month of the electricity, and I think it was $251." No business records or bills were introduced to show what amount, if any, the band paid.

The McAlisters argue, without citation to authority, that it was Hatbreeze's burden to prove its damages. However, it was the McAlisters' burden to prove

22

the amount by which Hatbreeze reduced its damages by renting the property to the band. See *Austin Hill Country Realty, Inc.*, 948 S.W.2d at 299. Because there was no evidence of the precise amount of rent paid by the band, the trial court did not err in finding that the McAlisters failed to meet their burden. We overrule their thirteenth issue.

## Conclusion

Having sustained the McAlisters' tenth and twelfth issues, and having overruled their other eleven issues, we modify the trial court's judgment to reduce the damage award by the $3,500 security deposit and to remove the award of attorney's fees. We affirm the judgment as modified.

LEE GABRIEL
JUSTICE

PANEL:  GARDNER, MEIER, and GABRIEL, JJ.

DELIVERED:  February 23, 2012