**TIMPTE INDUSTRIES, INC. and Timpte Inc., Petitioners,**

v.

**Robert GISH and Pinnacol Assurance, Respondents.**

No. 08–0043.

Supreme Court of Texas.

Argued March 11, 2009.

Decided June 5, 2009.

Gary M. Bellair, Robert L. Craig Jr. and Leonard Raymond Grossman, Craig Terrill Hale & Grantham, L.L.P., Lubbock, TX, for Petitioner.

James Hoytt Wood, Wood Law Firm, L.L.P., Amarillo, TX, Michael L. Byrd, Byrd & Associates, Lubbock, TX, and Blake Bradford Thompson, The Thompson Law Office, Stephenville, TX, for Respondent.

Justice MEDINA delivered the opinion of the Court.

Robert Gish was seriously injured when he fell from the top of a trailer into which he was attempting to load fertilizer. He

sued Timpte Industries, the manufacturer of the trailer, alleging, among other things, that several features of the trailer were defectively designed, rendering the trailer unreasonably dangerous. The trial court granted a no-evidence summary judgment in Timpte's favor, but the court of appeals reversed. 2007 Tex.App. LEXIS 9411, 2007 WL 4224411 (mem.op.). Finding no defect, we reverse the court of appeals' judgment and render judgment reinstating the trial court's summary judgment.

## I

On the morning of June 19, 2002, Robert Gish, a long haul trucker for Scott Hinde Trucking, arrived at the Martin Resources plant in Plainview, Texas, to pick up a load of ammonium sulfate fertilizer. Gish was familiar with the plant, as he had picked up fertilizer there once or twice a week for approximately the past year. That morning Gish checked his trailer, weighed it, and waited for another customer to finish loading.

Gish's Peterbilt truck was hauling a forty-eight-foot Super Hopper trailer manufactured by Timpte Inc., a subsidiary of Timpte Industries.[1] The Super Hopper trailer is a standard open-top, twin hopper trailer, which is loaded from above through use of a downspout or other device and is emptied through two openings on its bottom. Once the trailer is loaded, a tarp is rolled over the top to protect its contents.[2] A ladder and an observation platform are attached to the front and rear of the trailer to allow the operator to view its contents.

After the truck ahead of him finished loading, Gish backed his trailer under the downspout attached to the fertilizer plant and yelled to a Martin employee to begin loading. In a typical delivery, an employee inside the Martin plant uses a front-end loader to drop fertilizer into a hopper. The fertilizer is then dropped onto a conveyer system that moves it to the downspout outside the plant and into the waiting trailer.

To prevent the granulated fertilizer from being blown away during the loading process, Gish attempted to lower the downspout by using a rope attached to it. The rope was attached to the downspout for that purpose, but Gish could not get it to work. He had previously complained to Martin employees about problems lowering the downspout, but he did not do so again that morning. Instead, using the ladder attached to the front of the trailer, Gish climbed atop the trailer (as he had on several other occasions when the downspout would not lower) and attempted to lower the downspout by hand while standing on the trailer's top rail. This top rail is also the top of the trailer's side wall. It is made of extruded aluminum, is between 5 and 5.66 inches wide, and is nine-and-ahalf feet above the ground.

While Gish was standing on the top rail working with the downspout, a gust of wind hit him from the back, causing him to fall. This fall fractured his legs, broke his

---

1. Because the interests of Timpte Inc. and Timpte Industries are the same throughout these proceedings, we refer to them collectively as "Timpte."

2. The tarp assembly consists of two end caps-one on the front and one on the rear of the trailer-a latch plate that runs the length of the driver's side of the trailer, and seven curved metal bars that cross the trailer at approximately even intervals. These bars curve up towards the middle of the trailer, such that they form a peak down the trailer's center line. Two other metal bars run the length of the trailer on either side of this peak. This assembly supports the tarp when it is rolled over the trailer, and the latch plate allows the operator to tighten the tarp taut over the trailer.

ankles, and ruptured an Achilles tendon. Gish was in a wheelchair for six months, and he still has difficulty walking and standing.

Gish sued Martin and Timpte, asserting a cause of action for premises liability against Martin and causes of action for marketing, manufacturing, and design defects, misrepresentation, and breach of warranty against Timpte.[3] Specifically, Gish asserted that the warning labels on the Super Hopper trailer were insufficient to warn him of the danger of climbing on top of the trailer, and that the trailer contained two design defects:

- The top two rungs of the ladders attached to the front and rear of the trailer allow a person to climb atop the trailer; and
- The top rail of the trailer is too narrow and slippery and contains too many tripping hazards for a person to walk safely along it.

The two ladders on the trailer are made of rectangular tubing with rungs spaced twelve inches apart. The front ladder that Gish used to climb atop the trailer has five rungs-two below the observation platform (which is 38½ inches below the top of the front wall of the trailer), one approximately level with the platform, and two above the platform. The top rung of the ladder is thirteen inches below the top of the front wall of the trailer, and the rung second from the top is twelve inches below that. A metal bar approximately the length of the platform is mounted above the platform and near the top of the trailer to serve as a handhold while the operator stands on the platform.

Just below the middle rung of the ladder, Timpte has placed a rectangular warning label,[4] which reads:

### WARNING

1. EXERCISE EXTREME CAUTION WHILE CLIMBING ON ACCESS SYSTEM.

2. ALWAYS MAINTAIN 3–POINT CONTACT. (2 HANDS & 1 FOOT OR 2 FEET & 1 HAND)

3. DO NOT WEAR RINGS OR ANYTHING THAT CAN CATCH ON LADDER.

4. USE LADDER SIDE RAIL FOR HAND HOLD, NEVER USE THE RUNG.

5. NEVER CLIMB OVER THE TOP OF THE TRAILER AND ENTER THE INSIDE COMPARTMENTS FOR ANY REASON.

FAILURE TO FOLLOW THESE WARNINGS COULD RESULT IN SERIOUS INJURY OR DEATH.

As previously noted, the top rail of the trailer is made of extruded aluminum, which is extremely slippery. The seven bars that support the tarp also intersect with the top rail, presenting the alleged tripping hazards.

To remedy these alleged design defects, Dr. Gary Nelson, Gish's expert witness, proposed three design changes:

- Remove the top two rungs of the ladders attached to the trailer to make it impossible for a person to climb atop the trailer;

---

3. Pinnacol Assurance, the workers' compensation insurance carrier for Gish's employer, Scott Hinde Trucking, intervened in the suit and asserted its rights to subrogation for the more than $150,000 it has paid in benefits as a result of Gish's accident. Because Pinna- col's interests are aligned with Gish's, we refer to them collectively as "Gish."

4. There were several other warning labels on the front of the trailer, but none are relevant to Gish's claims.

- Provide an adequate foothold and handhold at the top of the trailer so that a user on top of the trailer can maintain three-point contact with the trailer at all times; and
- If an adequate handhold cannot be provided, then widen the side rail to at least 12 inches to provide an adequate foothold.

Timpte moved for a no-evidence summary judgment, which the trial court granted. The trial court then severed Gish's claims against Timpte from the remainder of the case, making the summary judgment final for purposes of appeal. The court of appeals affirmed the trial court's judgment as to all of Gish's claims except his claim for design defect, concluding that there was "some evidence upon which reasonable factfinders could disagree as to whether the trailer's design was both unreasonably dangerous and a cause of Gish's fall." 2007 Tex.App. LEXIS 9411, at * 11–12, 2007 WL 4224411, at *4.

## II

A no-evidence summary judgment motion under Rule 166a(i) is essentially a motion for a pretrial directed verdict; it requires the nonmoving party to present evidence raising a genuine issue of material fact supporting each element contested in the motion. Tex.R. Civ. P. 166a(i); *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 581–82 (Tex.2006). When reviewing a no-evidence summary judgment, we "review the evidence presented by the motion and response in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *Mack Trucks*, 206 S.W.3d at 582 (citing *City of Keller v. Wilson*, 168

S.W.3d 802, 827 (Tex.2005); *Johnson v. Brewer & Pritchard, P.C.,* 73 S.W.3d 193, 208 (Tex.2002)).

We begin with the grounds for Timpte's no-evidence summary judgment motion. Gish contends that Timpte's motion challenged only Gish's allegation that a design defect in the Super Hopper was the producing cause of his injury, not that there was a defect rendering the product unreasonably dangerous. Because the motion did not raise this issue, Gish concludes that the trial court erred in rendering its no-evidence summary judgment in favor of Timpte.

It *is* well settled that a trial court cannot grant a summary judgment motion on grounds not presented in the motion. *Brewer & Pritchard, P.C.,* 73 S.W.3d at 204; *Science Spectrum, Inc. v. Martinez,* 941 S.W.2d 910, 912 (Tex.1997). Our no-evidence summary judgment rule similarly requires that the moving party identify the grounds for the motion:

> After adequate time for discovery, a party without presenting summary judgment evidence may move for summary judgment on the ground that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial. The motion must state the elements as to which there is no evidence. The court must grant the motion unless the respondent produces summary judgment evidence raising a genuine issue of material fact.

Tex.R. Civ. P. 166a(i). We have further explained that "[t]he motion must be specific in challenging the evidentiary support for an element of a claim or defense; paragraph (i) does not authorize conclusory motions or general no-evidence challenges to an opponent's case." *Id.* at Comment–1997.

■ The underlying purpose of this requirement "is to provide the opposing party with adequate information for opposing the motion, and to define the issues for the purpose of summary judgment." *Westchester Fire Ins. Co. v. Alvarez*, 576 S.W.2d 771, 772 (Tex.1978). We have analogized this purpose to that of the "fair notice" pleading requirements of Rules 45(b) and 47(a). *Id.* at 772–73; *see also* TEX.R. CIV. P. 45(b) (requiring a party's pleadings to give "fair notice" to the opponent); TEX.R. CIV. P. 47(a) (requiring a plaintiff's pleadings to give "fair notice of the claim involved").

■ After setting forth the elements of a design defect claim, Timpte's motion stated that "[p] laintiff has presented no evidence of a design defect which was a producing cause of his personal injury." In a subsequent paragraph labeled "Conclusion" Timpte restated: "There is no evidence of the product being defective or unreasonably dangerous, and there is no evidence the trailer was the proximate or producing cause of the Plaintiff's injuries." The motion thus unambiguously set out the elements of Gish's design defect claim and Timpte's belief that there was no evidence that its trailer was either unreasonably dangerous or the producing cause of Gish's injury. Although such a motion may be insufficient to give fair notice in a case involving a complex product or raising complicated issues of design defect, here the complaint was simple and straightforward; the record reveals no confusion of Gish's claim or Timpte's assertions of no evidence. Gish responded thoroughly as to both elements, indicating his understanding of Timpte's motion.

We conclude that Timpte's motion gave fair notice to Gish that it was challenging both whether the alleged defect rendered the trailer unreasonably dangerous and whether the defect was the producing cause of Gish's injury. Timpte's motion was not the type of "conclusory motion[ ] or general no-evidence challenge[ ] to an opponent's case" barred by Rule 166a(i). The issues of design defect and producing cause were clearly raised in Timpte's motion and joined in Gish's response.

III

■ To recover for a products liability claim alleging a design defect, a plaintiff must prove that (1) the product was defectively designed so as to render it unreasonably dangerous; (2) a safer alternative design existed; and (3) the defect was a producing cause of the injury for which the plaintiff seeks recovery. *Hernandez v. Tokai Corp.*, 2 S.W.3d 251, 256–57 (Tex.1999); TEX. CIV. PRAC. & REM.CODE § 82.005(a); *see also McKisson v. Sales Affiliates, Inc.*, 416 S.W.2d 787 (Tex.1967) (adopting RESTATEMENT (SECOND) OF TORTS § 402A (1965)). To determine whether a product was defectively designed so as to render it unreasonably dangerous, Texas courts have long applied a risk-utility analysis that requires consideration of the following factors:

(1) the utility of the product to the user and to the public as a whole weighed against the gravity and likelihood of injury from its use; (2) the availability of a substitute product which would meet the same need and not be unsafe or unreasonably expensive; (3) the manufacturer's ability to eliminate the unsafe character of the product without seriously impairing its usefulness or significantly increasing its costs; (4) the user's anticipated awareness of the dangers inherent in the product and their avoidability because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions; and (5) the expectations of the ordinary consumer.

*American Tobacco Co. v. Grinnell,* 951 S.W.2d 420, 432 (Tex.1997); *see also Hernandez,* 2 S.W.3d at 256 (citing *Turner v. Gen. Motors Corp.,* 584 S.W.2d 844, 847 (Tex.1979)).

 The risk-utility analysis does not operate in a vacuum, but rather in the context of the product's intended use and its intended users. *Hernandez,* 2 S.W.3d at 259–60 (risk-utility analysis of a cigarette lighter must be conducted in light of its intended adult users); *Caterpillar Inc. v. Shears,* 911 S.W.2d 379, 383–84 (Tex. 1995) (risk-utility analysis of a front-end loader with a removable canopy conducted in light of its specialized use in low-clearance areas). Although whether a product is defective is generally a question of fact, in the appropriate case, it may be determined as a matter of law. *Hernandez,* 2 S.W.3d at 260–61 ("[T]he issue of whether the product is unreasonably dangerous as designed may nevertheless be a legal one if reasonable minds cannot differ on the risk-utility analysis considerations."); *Grinnell,* 951 S.W.2d at 432.

In this regard, we have also rejected the contention that Texas should follow the "open and obvious danger rule":

> A number of courts are of the view that obvious risks are not design defects which must be remedied. *See, e.g., Gray [v. Manitowoc Co.],* 771 F.2d [866,] 870 [ (5th Cir.1985) ] (applying Mississippi law); *Delvaux v. Ford Motor Co.,* 764 F.2d 469, 474 (7th Cir.1985) (applying Wisconsin law); *Young v. Tide Craft, Inc.,* 270 S.C. 453, 242 S.E.2d 671, 680 (1978). However, our Court has held that liability for a design defect may

attach even if the defect is apparent. *Turner,* 584 S.W.2d at 850.

*Shears,* 911 S.W.2d at 383; *see also Hernandez,* 2 S.W.3d at 258 ("[I]n general, the obviousness of danger in and of itself is not an absolute bar ... to liability for a defective design.").[5] We have noted, however, that the obviousness of the claimed defect is "an important consideration in determining whether the product is unreasonably dangerous ... [and] may even be decisive in a particular case." *Hernandez,* 2 S.W.3d at 258.

Gish alleges that the Super Hopper trailer was defectively designed in two ways: (1) the top rail of the trailer was too narrow and presented tripping hazards; and (2) the top two rungs of the ladders mounted on the trailer were unnecessary and allowed the operator to climb to the top of the trailer. Essentially, Gish complains that the trailer's design failed to prevent him from climbing atop the trailer and then, once he was up there, failed to protect him from the risk of falling.

There is no evidence, however, that the top rail of the trailer is unreasonably dangerous in light of its use and purpose. As already noted, the top rail from which Gish fell is only 5 to 5.66 inches wide and made of extruded aluminum, an extremely slippery surface. Timpte's executive vice president of manufacturing and engineering, Jeffrey Thompson, testified that the top rail was designed this way for two reasons: (1) the width of the top rail is only as wide as necessary to support the front end of the trailer; and (2) the top rail is made of extruded aluminum and slants slightly towards the inside of the trailer so

---

**5.** This is also the rule adopted by the Restatement. RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2 cmt. d (1998) ("Subsection (b) does not recognize the obviousness of a design-related risk as precluding a finding of defectiveness. The fact that a danger is open and obvious is relevant to the issue of defectiveness, but does not necessarily preclude a plaintiff from establishing that a reasonable alternative design should have been adopted that would have reduced or prevented injury to the plaintiff.").

that any commodity that spills onto the top rail will slide into the trailer. Thompson testified that, were the top rail to be widened, it would add to the total weight of the trailer thereby reducing the weight of the commodity that the trailer would be permitted to carry. The utility of this design—maximizing the amount of commodity that the trailer can haul while keeping the structure of the trailer sound—is undeniably very high.

The corresponding risk of someone being injured the way Gish was is extremely low. The risk of falling while trying to balance on a 5 inch wide strip of extruded aluminum nearly ten feet above the ground is an obvious risk that is certainly "within the ordinary knowledge common to the community." *See Caterpillar Inc. v. Shears,* 911 S.W.2d 379, 382 (Tex.1995) (internal quotation marks omitted). Whether the risk of injury is common knowledge is a question of law, not fact. *Id.* at 383.[6] In *Shears,* we determined that the proper inquiry is whether an average user of the product would recognize the risks entailed by the use of the product as-is. *Id.; see also Sauder Custom Fabrication Inc. v. Boyd,* 967 S.W.2d 349, 350–51 (Tex.1998) (per curiam) ("The consumer's perspective is that of an ordinary user of the product, not necessarily the same as that of an ordinary person unfamiliar with the product."). Applying that principle, we held as a matter of law that the risks presented by the open cab of a front-end loader were obvious to the average user, such that no warning was required. *Shears,* 911 S.W.2d at 383. The risk of falling from the top of the trailer while trying to balance on a five-inch strip of extruded aluminum is equally obvious to

an average user of the Super Hopper trailer.

■ As noted, though, the fact that the alleged defect is open and obvious, although an important consideration, is generally not determinative in Texas. *Hernandez v. Tokai Corp.,* 2 S.W.3d 251, 258 (Tex.1999). Timpte, however, asks that we revisit this rule, arguing that, in other contexts, the open and obvious nature of a danger is decisive. *Gen. Elec. Co. v. Moritz,* 257 S.W.3d 211 (Tex.2008) (premises owner owes no duty to warn an independent contractor's employees of an open and obvious danger); *Humble Sand & Gravel, Inc. v. Gomez,* 146 S.W.3d 170, 183–84 (Tex.2004) (product seller owes no duty to warn of commonly known risks of the product's use). But we have long recognized that, in the context of an obvious risk, the duty to warn of defects is distinct from the duty to design safe products. *Compare Turner v. Gen. Motors Corp.,* 584 S.W.2d 844, 850 (Tex.1979) (recognizing design defect claim even if defect is apparent), *with Joseph E. Seagram & Sons, Inc. v. McGuire,* 814 S.W.2d 385, 387–88 (Tex.1991) (no duty to warn of risks associated with prolonged and excessive alcohol consumption because such risks are common knowledge). As the Restatement notes:

> Warning of an obvious or generally known risk in most instances will not provide an effective additional measure of safety. Furthermore, warnings that deal with obvious or generally known risks may be ignored by users and consumers and may diminish the significance of warnings about non-obvious, not-generally-known risks. Thus, requiring warnings of obvious or generally

---

**6.** We again recognize that in some situations, however, "there could be a fact question about whether consumers have common

knowledge of risks associated with a product." *Shears,* 911 S.W.2d at 383. This is not such a situation.

known risks could reduce the efficacy of warnings generally.

RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2 cmt. j (1998). The focus of a design defect claim, however, is whether there was a reasonable alternative design that, at a reasonable cost, would have reduced a foreseeable risk of harm. *Id.* § 2 cmt. d. Thus, if it is reasonable for a product's designer to incorporate a design that eliminates an open and obvious risk, the product reaches a more optimum level of safety by incorporating the safer design than by keeping the current design with the open and obvious risk. *See id.* § 2 cmt. a. We see no reason to discard the risk-utility analysis that Texas courts have long-applied to encourage manufacturers to reach an optimum level of safety in designing their products.

 Nevertheless, the risk-utility factors here confirm that the design of the Super Hopper trailer was not defective as a matter of law. Timpte warned users to always maintain three-point contact with the trailer, which is impossible for a user standing on the top rail. Had Gish adhered to this warning, his accident would not have happened. Additionally, widening the side walls of the trailer so as to convert the top rail into a safe walkway, as Gish's expert proposed, would have increased the cost and weight of the trailer while decreasing its utility.[7] The Federal Highway Administration generally limits the gross vehicle weight of a commercial motor vehicle to 80,000 pounds; therefore, any increase in the unloaded weight of the trailer results in a decrease of the amount of commodity the trailer can haul, thus reducing its overall utility to users. 23

C.F.R. § 658.17 (2008). The width of the top rail of the Super Hopper trailer is therefore not a design defect that renders the trailer unreasonably dangerous.

 There is also no evidence that the top two rungs of the ladder are a design defect that renders the trailer unreasonably dangerous. Thompson testified that the top two rungs are necessary to maintain the structure and stability of the ladder when the side rails are under pressure; without them, the ladder could twist or bend. Additionally, even though Timpte warned users to use the side rails of the ladder as a handhold when climbing the ladder, were a user's hands to slip, the additional rungs provided additional handholds and an additional measure of safety. Thus, the utility of the ladder as constructed is high.

Conversely, the risk of injury from the use of the ladder is very slight. Gish's injury is only remotely related to the ladder's top two rungs: they allowed him to climb atop the trailer, where he was subsequently injured. Timpte warned users not to use the ladder to climb into the trailer itself, and the obvious nature of the risk of climbing onto the top rail negates the need for any additional warning. *See Caterpillar Inc. v. Shears*, 911 S.W.2d 379, 382–83 (Tex.1995). Therefore, any risk from the ladder itself stems only from the risk that a user will ignore both Timpte's warnings and open and obvious dangers.

Additionally, as noted above, removal of the top two rungs, although it might have prevented Gish's injury,[8] might also increase the risk of injury to others who might need those rungs as a failsafe hand-

---

**7.** Widening the side rail would also encourage other users of the Timpte trailer to use the side rail as a walkway, thus actually making it less safe.

**8.** As the observation platform is only 38½ inches below the top rail of the trailer, Gish could have climbed atop the trailer from this perch even if the top two rungs of the ladder had been removed.

hold. Removing the top two rungs could also cause the ladder to bend or become unstable under pressure, thereby increasing the risk of danger from its use. The inclusion of the top two rungs of the ladder is therefore not a design defect that renders the Super Hopper unreasonably dangerous.

\* \* \* \* \* \*

Because there is no evidence that the design defects alleged by Gish rendered the trailer unreasonably dangerous, we reverse the court of appeals' judgment and render judgment reinstating the trial court's summary judgment.[9]

---

9. Before this appeal, Gish's premises liability claims against Martin Resources were severed from the claims against Timpte and left pending in the trial court.