# IN THE SUPREME COURT OF TEXAS

══════════
No. 13-0042
══════════

GENIE INDUSTRIES, INC., PETITIONER,

v.

RICKY MATAK, BELINDA MATAK AND MISTY SONNIER, AS REPRESENTATIVE OF THE
ESTATE OF WALTER PETE LOGAN MATAK, DECEASED, RESPONDENTS

══════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRTEENTH DISTRICT OF TEXAS
══════════════════════════════

JUSTICE BOYD, joined by JUSTICE LEHRMANN and JUSTICE DEVINE, dissenting.

If I had been a juror at this trial, I probably would have decided that Genie Industries' AWP 40-S aerial work platform lift is not unreasonably dangerous and thus not defectively designed. But I'm not sure, nor need I be, because no one is asking what I would have decided if I had been a juror. We are not asked in this case which alleged facts are true and which are false, nor are we asked whether the lift's risks outweigh its utility. Instead, Genie is asking the only evidentiary question it can ask this Court: whether the trial record contains any evidence—anything more than a "mere scintilla"—that would allow a reasonable juror to find that the lift's risks outweigh its utility, making the lift unreasonably dangerous and thus defectively designed. As the Court explains, this risk-utility balancing determination is a question of fact for the jury, and we cannot trump the jury's decision unless no reasonable juror hearing the evidence in this case could possibly have reached it. This record contains at least some evidence that it was both foreseeable

and likely that untrained non-professionals would use the Genie lift, that they would destabilize it while the platform was raised and occupied despite the warnings and the allegedly obvious dangers, and that doing so would result in serious injuries and death, no matter how high the platform is elevated. Because this evidence, viewed in the light most favorable to the jury's verdict, would permit a reasonable juror to find that the lift's risks outweigh its utility, I respectfully dissent.

## I.
## The Standard of Review

Our well-established standard of review controls my decision in this case. The issue of "whether a product is unreasonably dangerous . . . is a question of fact for the jury" to decide, "taking into consideration the utility of the product and the risk involved in its use." *Am. Tobacco Co. Inc. v. Grinnell*, 951 S.W.2d 420, 432 (Tex. 1997). The factors relevant to that balancing analysis are "for the jury to consider when determining whether a product was defectively designed." *Id.*[1] In fulfilling its duty, the jury may rely on both direct and circumstantial evidence, and often, "proof of the defect . . . can only be made by circumstantial evidence." *Pittsburg Coca-Cola Bottling Works of Pittsburg v. Ponder*, 443 S.W.2d 546, 548 (Tex. 1969). The jury "may believe one witness and disbelieve others" and "resolve inconsistencies in the testimony of any witness." *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986). The jury may draw reasonable inferences from the evidence, and on appeal, "[w]hether *other* possible inferences may

---

[1] *See also Boatland of Hous., Inc. v. Bailey*, 609 S.W.2d 743, 746 (Tex. 1980) ("The jury may consider many factors before deciding whether a product's usefulness or desirability are outweighed by its risks."); *Turner v. Gen. Motors Corp.*, 584 S.W.2d 844, 851 (Tex. 1979) (describing question and instructions to be presented to jury when "considerations of utility and risks are present in the state of the evidence, and in such cases should serve as an appropriate aid to the jury in its deliberations").

2

be drawn from the evidence is not the relevant inquiry." *Havner v. E-Z Mart Stores, Inc.*, 825 S.W.2d 456, 459 (Tex. 1992) (emphasis added).

The jury found in this case that the Genie lift's risks outweigh its utility, and Genie contends that no legally sufficient evidence supports that finding. To prevail in this appeal, Genie must show that there is "no more than a mere scintilla" of evidence that the lift's risks outweigh its utility. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998). In deciding whether the record contains legally sufficient evidence, we must view the evidence "most favorably in support of the [jury's] finding." *Havner*, 825 S.W.2d at 458. As an appellate court we are "not a fact finder," and we may not "substitute [our] judgment for that of the jury, even if the evidence would clearly support a different result." *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998). That is not to say that the evidence in every case will always create a jury issue on the risk-utility determination. "Although whether a product is defective is generally a question of fact, in the appropriate case, it may be determined as a matter of law." *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 312 (Tex. 2009). In describing what the appropriate case is, we have explained that "the issue of whether the product is unreasonably dangerous as designed may nevertheless be a legal one if reasonable minds cannot differ on the risk-utility analysis considerations." *Hernandez v. Tokai Corp.*, 2 S.W.3d 251, 261 (Tex. 1999).

Thus, we cannot reverse this jury's determination unless the evidence was such that "reasonable minds cannot differ on the risk-utility analysis considerations." *Id.* This Court "cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within this zone of reasonable disagreement." *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 1995). Under this standard of review, the outcome of a risk-utility balance will "rarely" be decided as a matter of

3

law in design defect cases "when any of these elements is disputed." AM. L. PROD. LIAB.3D § 28:19 (1997). As the Supreme Court of Georgia has observed, by adopting the risk-utility analysis as the basis for design-defect liability and entrusting juries to conduct that balancing analysis, we have necessarily "increased the burden of a defendant, in seeking a judgment as a matter of law, to show plainly and indisputably an absence of *any* evidence that a product as designed is defective." *Ogletree v. Navistar Int'l Transp. Corp.*, 522 S.E.2d 467, 470 (Ga. 1999) (emphasis in original).

In short, we cannot "second guess" the jury. *State v. $11,014.00*, 820 S.W.2d 783, 785 (Tex. 1991). This is not simply our rule; it is a principle that derives directly from our Constitution's guaranty of the right to trial by jury, and "courts must not lightly deprive our people of this right by taking an issue away from the jury." *Universe Life Inc. Co. v. Giles*, 950 S.W.2d 48, 56 (Tex. 1997). Our duty in this case, therefore, is well-established: we must determine whether the evidence that the jury heard and observed "would enable reasonable and fair-minded people to differ in their conclusions." *City of Keller*, 168 S.W.3d at 822. If "the evidence falls within this zone of reasonable disagreement," we must accept the jury's verdict. *Id*. We can only reject the jury's finding if, in light of the evidence, "reasonable minds cannot differ." *Timpte*, 286 S.W.3d at 312 (quoting *Hernandez,* 2 S.W.3d at 260–61).

## II.
## Unreasonably Dangerous

To prevail on their claim that Genie defectively designed the lift, the Mataks were required to prove that "(1) the product was defectively designed so as to render it unreasonably dangerous; (2) a safer alternative design existed; and (3) the defect was a producing cause of the injury for which the plaintiff seeks recovery." *Timpte*, 286 S.W.3d at 311. Genie does not dispute that the evidence supports the third element (producing cause), and the Court and I agree that the Mataks

4

offered legally sufficient evidence of the second (safer alternative design). Unlike the Court, however, I conclude that the record contains legally sufficient evidence to support the jury's finding of the first element: that the lift was unreasonably dangerous. The evidence certainly did not conclusively establish this, and it probably would not have been enough to persuade me if I had been on the jury. But on this record, I cannot conclude that no reasonable and fair-minded juror could disagree with me. Instead, I conclude that, on this record, reasonable minds can differ.

## A.     The Risk-Utility Analysis

To decide whether a product design is unreasonably dangerous, the jury must balance the product's utility against the risks involved in its use. *Caterpillar, Inc. v. Shears*, 911 S.W.2d 379, 383–84 (Tex. 1995); *Turner v. Gen. Motors Corp.*, 584 S.W.2d 844, 850 (Tex. 1979). We have identified five factors that may be relevant to the jury's risk-utility balancing determination:

(1)      the utility of the product to the user and to the public as a whole weighed against the gravity and likelihood of injury from its use;

(2)      the availability of a substitute product which would meet the same need and not be unsafe or unreasonably expensive;

(3)      the manufacturer's ability to eliminate the unsafe character of the product without seriously impairing its usefulness or significantly increasing its costs;

(4)      the user's anticipated awareness of the dangers inherent in the product and their avoidability because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions; and

(5)      the expectations of the ordinary consumer.

*Timpte*, 286 S.W.3d at 311 (citing *Grinnell*, 951 S.W.2d at 432).[2]

---

[2] This Court has never explained how, or even whether, appellate courts should utilize these factors when conducting a no-evidence review of a jury's verdict. In all of the cases in which we utilized these five factors, we were reviewing a trial court's decision on summary judgment, not a jury verdict. *See Timpte*, 286 S.W.3d at 308; *Hernandez*, 2 S.W.3d at 255; *Grinnell*, 951 S.W.3d at 425. We referred to various factors when reviewing a jury verdict in *Martinez*, but we did not utilize them in our no-evidence analysis. *Martinez*, 977 S.W.2d at 335. In other cases

5

By design, this risk-utility analysis is a fluid process. The first factor sets forth the basic balancing test that the jury must conduct: weighing the product's usefulness (its utility) against the likelihood and seriousness of injuries that its use may cause (its risks). To oversimplify the analysis, if the product's risks outweigh its utility, it is unreasonably dangerous, and if its utility outweighs its risks, it is not. But neither the determination of a product's utility and risks nor the weighing of the two is that simple. A product's utility is not just its usefulness, but its degree of usefulness and the relative uniqueness of that usefulness as compared to other products. In this sense, the second and third factors—the availability of a substitute product and the ability to eliminate the unsafe character of the product—aid in determining the weight of the product's utility. If a product is extremely useful, but other safer products or designs are similarly or more useful, its utility may be relatively low, in spite of its extreme usefulness. By contrast, if it is only minimally or rarely useful, but no safer products or designs are as useful, then its utility might be very high.

Similarly, a product's risks are not just the dangers it creates, but the nature, likelihood, and extent of those dangers. In this sense, the fourth and fifth factors—the user's awareness and

---

involving a jury verdict—including our most recent decision—we "analyze[d] the evidence in light of the charge as given," without ever referring to the factors. *Kia Motors Corp. v. Ruiz*, 432 S.W.3d 865, 875 (Tex. 2014); *see also Caterpillar*, 911 S.W.2d at 384. Whether and how appellate courts should utilize the factors when reviewing a jury verdict is a relevant issue because we have held that the factors should not be included in the jury instructions, so the jury will never actually be aware of these factors when making its decision. *Turner*, 584 S.W.2d at 849 (explaining that "the analysis [of the factors] is most helpful and can be used by appellate and trial judges, and by students and commentators, but that it is not normally given to the jury"). It makes little sense for appellate courts to utilize specific factors to determine whether evidence supports a jury's verdict when the jury was not instructed to consider those factors. Since the factors, at least in theory, limit the scope of the risk-utility analysis, the better rule would be that appellate courts, when reviewing a jury verdict, should consider whether any evidence supports the jury's finding when measured against the jury instructions, whether that evidence fits within the factors or not. Since neither party raises this issue in this case, however, and since there is evidence to support the jury's verdict even when analyzed in light of the listed factors, we need not decide that issue here.

6

the avoidability of the dangers due to general knowledge, obviousness, warnings, and the ordinary consumer's expectations—aid in determining the weight of the product's risks. If a product is extremely dangerous, but consumers and users are aware of those dangers and consistently avoid them, its actual risks may be quite low. But a relatively safe product may present a very high risk if unsuspecting users are severely injured by the rare danger it does present. A product with very high utility, due to its great usefulness and the unavailability of substitute products or designs, is unlikely to be unreasonably dangerous unless the risks are also extremely high. A product that creates very high risks, by contrast, is likely to be unreasonably dangerous unless its utility is also extremely high.

We have made it very clear that the fluid process that this risk-utility analysis requires is not susceptible to absolutes. For example, the analysis does not absolutely require manufacturers to warn of a product's risks, especially if those risks are obvious and apparent to the ordinary user. *Caterpillar*, 911 S.W.2d at 382.[3] But it also does not absolutely absolve a manufacturer that provides an adequate warning, because "it is not at all unusual for a person to fail to follow basic warnings and instructions." *Martinez*, 977 S.W.2d at 337 (quoting *Gen. Motors Corp. v. Saenz*,

---

[3] The Court relies on *Caterpillar* to support its matter-of-law conclusion that the Genie lift's risks do not outweigh its utility. When addressing the plaintiff's defective-design claim in *Caterpillar*, however, the Court held that the claim failed as a matter of law not because there was no evidence that the product's risks outweighed its utility, but because the plaintiff "offered no evidence of a safer design . . . that could perform the same tasks" as the product at issue. *Id.* at 384. The Court resolved the defective design claim in that case based on the lack of any evidence of a safer alternative design, not based on the risk-utility determination. The Court also held as a matter of law that the manufacturers "did not have the duty to warn" because the dangers were obvious to the product's ordinary user. *Id.* at 383. The Court relied on *Joseph E. Seagram & Sons, Inc. v. McGuire*, 814 S.W.2d 385 (Tex. 1991), in which the Court held as a matter of law that the defendant owed no duty to warn of "the danger of developing the disease of alcoholism from prolonged and excessive consumption of alcoholic beverages." *Id.* at 385. We have recognized that "the duty to warn of defects is distinct from the duty to design safe products," and that the obviousness of a risk is not determinative of the latter duty in Texas. *Timpte*, 286 S.W.3d at 313. Moreover, "[i]t is firmly established in Texas that the existence and elements of a common law duty are ordinarily legal issues for the court to decide." *Humble Sand & Gravel, Inc. v. Gomez*, 146 S.W.3d 170, 181 (Tex. 2004). In short, the Court's matter-of-law conclusions in *Caterpillar* did not involve the risk-utility analysis at all.

7

873 S.W.2d 353, 358 (Tex. 1993)). Nor does it absolutely absolve a manufacturer when "the defect is apparent." *Id*. at 336; *Timpte*, 286 S.W.3d at 312 ("liability for a design defect may attach even if the defect is apparent"); *Turner*, 584 S.W.2d at 850 (same).

It used to be the law in Texas that the plaintiff's awareness and appreciation of the risk, whether due to warnings or to the obviousness of the risk, was an absolute defense against a defective-design claim. *See Rourke v. Garza*, 530 S.W.2d 794, 800 (Tex. 1975) ("It is an appropriate defense that the user voluntarily exposed himself to the risk posed by the defective product with knowledge and appreciation of the danger."), *abrogated on other grounds by Ford Motor Co. v. Ledesma*, 242 S.W.3d 32 (Tex. 2007). But we have since rejected such absolutes, holding that an "open and obvious" and "generally known" danger can give rise to liability, *see Timpte*, 286 S.W.3d at 313, and an otherwise adequate warning is not a bar to liability, *id.* at 313–14. Under the risk-utility analysis, "warnings and safer alternative designs are factors, among others, for the jury to consider in determining whether the product as designed is reasonably safe." *Martinez*, 977 S.W.2d at 337. A product may thus be unreasonably dangerous as designed even if the defect is apparent or the manufacturer has adequately warned of the dangers, because the anticipated awareness and avoidability of the dangers and the ordinary consumer's expectations are not absolutes. Instead, they "are but two factors for the jury to consider when determining whether a product was defectively designed." *Grinnell*, 951 S.W.2d at 432; *see also Hernandez*, 2 S.W.3d at 257; *Martinez*, 977 S.W.2d at 335–37.

We have rejected such absolute rules in favor of the more fluid risk-utility analysis because that analysis provides a more effective way to "encourage manufacturers to reach an optimum level of safety in designing their products." *Timpte*, 286 S.W.3d at 314. A design that eliminates a

risk is safer than a design that retains the risk, even if the risk is open and obvious or warned against. *Id.* As "we have long recognized[,] . . . the duty to warn of defects is distinct from the duty to design safe products," even "in the context of an obvious risk." *Id.* at 313. "Thus, if it is reasonable for a product's designer to incorporate a design that eliminates an open and obvious risk, the product reaches a more optimum level of safety by incorporating the safer design than by keeping the current design with the open and obvious risk." *Id.*

In this case, the Court concludes, as a matter of law, that the Genie lift was not unreasonably dangerous because its risks were both obvious and warned against. While those facts are certainly important to the risk-utility analysis, the Court's own precedent rejects the idea that they make the lift safe *as a matter of law*. "The fact that a product user is or should be aware of the existence and avoidability of dangers inherent in a product's use that are obvious, commonly known, or warned against, . . . may . . . be decisive in a particular case." *Hernandez*, 2 S.W.3d at 258. But such a determination cannot be based merely on the existence of a warning or obviousness of the dangers, as if either were "an absolute bar—like certain affirmative defenses—to liability for a defective design." *Id.* We must therefore review the record in this case to determine whether it contains any evidence that would allow a reasonable juror to conclude that the risks of the Genie lift outweigh its utility, in spite of the warnings and the allegedly obvious nature of its risks.

## B.    The Utility of the Lift

The evidence regarding the lift's utility is essentially undisputed in this case. As the Court explains, the evidence established that the lift, while able to reach heights exceeding forty feet, is relatively lightweight, portable, compact enough to fit through ordinary doorways, capable of being moved and operated by a single person working alone, and relatively inexpensive. Genie's

9

corporate representative and director of product safety, Rick Curtin, emphasized that the lift's portability was "very important," and was "the key thing that makes the machine useful." The Mataks essentially offered no evidence to contradict this. Instead, they sought to prove that, as useful as Genie's lift may be, the fact that safer alternative designs exist reduces the weight of its utility, and that the risk of serious injury from misuse was also substantial. The Court acknowledges this evidence, but concludes that the "factors . . . conclusively establish that the [Genie lift] is not . . . unreasonably dangerous." *Ante* at __. I agree that the evidence conclusively establishes that the lift's utility is substantial. But the jury concluded that its risks outweighed its utility, however great its utility may be. Thus, we must decide whether there is more than a "mere scintilla" of evidence that the lift's risks outweighed its undisputed utility.

## C.     Identifying the *Relevant* Risk

To conduct the risk-utility analysis, we must first identify the product's relevant risk. The first factor identifies the risk as "the gravity and likelihood of injury from [the product's] use." The evidence in this case conclusively established that the toppling of a lift could cause extremely grave injuries: this lift's fall from forty feet resulted in Logan Matak's death, and everyone agrees that a fall from even lower heights can also cause serious injury or death. Moreover, Genie admitted that it is foreseeable that the lift will tip over if the leveling jacks attached to the outriggers are raised while the lift is extended and occupied. Genie warned against this very danger: "**Attempting to move the machine with the platform raised will tip the machine over and *cause death or serious injury.***" According to the Mataks, the evidence supports the jury's finding that the lift was unreasonably dangerous because, despite the foreseeability of such accidents and the likelihood of such serious injuries, Genie "did nothing to eliminate this risk" and instead just

10

put a warning on it.

In response, Genie contends that these risks arise only if the lift is misused, in a way that is contrary to the instructions and disregards both the warning and the "open and obvious dangers." Genie relies on our decision in *Timpte*, in which we found no evidence that a dual-hopper grain trailer was unreasonably dangerous and noted that "any risk from [the defendant's product] itself stems only from the risk that a user will ignore both [the defendant's] warnings and open and obvious dangers." *Timpte*, 286 S.W.3d at 314. According to Genie, our "analysis [in *Timpte*] about how to weigh facts involving a *high utility* product where the associated risk is *obvious* and described in *clear warnings* and where the risk arises only in the unlikely event of *intentional misuse* should be dispositive here." Because the lift's utility is undeniably high and the only risks are obvious risks that result only from misuse, Genie contends, we should hold that the product is not unreasonably dangerous as a matter of law, just as we did in *Timpte*.[4]

We did not hold in *Timpte*, however, that risks that arise only from the misuse of a product are irrelevant to the risk-utility analysis, or that a product cannot be unreasonably dangerous if its only risks result from misuse. To the contrary, we explained in *Hernandez* that "the fact that the foreseeable risk of harm is due to a misuse of the product, rather than an intended use, is not an absolute bar to liability for that portion of an injury caused by a product's defective design." *Hernandez*, 2 S.W.3d at 257. "Instead," we explained, "misuse of a product is a factor that must

---

[4] Two amicus curiae, the Texas Association of Defense Counsel and the Association of Equipment Manufacturers, have filed briefs supporting Genie's argument on this point. The TADC asserts that, contrary to our decision in *Timpte*, the court of appeals here gave "controlling weight to risks caused by intentional misuse and disregarding obvious risks," when "the risk of harm arises only when users disregard adequate warnings and obvious dangers." Similarly, the AEM contends that, contrary to *Timpte*, the court of appeals "gave no weight at all to the intentional misuse, the significant warnings included on the Genie platform, and the obviousness of the risk."

11

be considered in allocating responsibility for the injury." *Id*. When misuse is a factor in the risk-utility analysis, and the product's only dangers result from its misuse, the nature of the *relevant* risk necessarily changes. We made this point clear in *Hernandez*, in which the plaintiff alleged that a cigarette lighter was defectively designed and unreasonably dangerous because it lacked a child-resistant safety mechanism. *Id.* at 255. We explained in that case that the relevant risk "is not that a child who plays with a lighter may harm himself. We assume that that risk is substantial. . . . Rather, the risk is that a lighter will come into a child's hands." *Id*. at 260. "The relevant risk," we explained, "includes consideration of both the likelihood that adults will allow children access to lighters and the gravity of the resulting harm." *Id*.

In the same way, the question here is not whether it was foreseeable and likely that raising the leveling jacks while the lift is elevated and occupied would cause the lift to tip over and seriously harm its occupant. No one disputes here that it was. The question here is whether this misuse was foreseeable and likely in spite of both the allegedly obvious dangers and the existence of the warning. As Genie argues, the Mataks "conflate the risks arising from a misuse with the risk that a product will be misused in the first place." I agree with Genie that the relevant risk in this case is "the likelihood that the product will be misused" in a way that results in injury. Thus, the relevant risk here was the risk that operators would raise the leveling jacks and attempt to move the lift when the platform is elevated and occupied, despite the warning and the allegedly obvious and open dangers.

## D.      The Evidence of the Relevant Risk

Genie contends, and the Court agrees, that there is no evidence in this record that the risk of this kind of misuse was foreseeable and likely despite the warning and obvious dangers. Genie

12

acknowledges that the record contains three reports regarding similar accidents that occurred when those operators, like the operators in this case, raised the leveling jacks while the platform was elevated and occupied.[5] The jury heard testimony and received accident reports about those similar accidents. But Genie contends that all of those accidents involved less serious injuries because the platform was much lower when the lifts tipped over. And more importantly, Genie asserts that the evidence of those three accidents did not indicate a "likelihood" of such accidents because the evidence also established that Genie has sold "hundreds of thousands" of these lifts worldwide, and they have been used without incident "literally 'millions' of times." Genie contends that the evidence thus conclusively establishes that the relevant risk is "very slight."

The Court agrees with Genie, emphasizing that the evidence in this record of similar accidents and misuses did not indicate that the platform was "fully elevated" when the users tried to move the lift in those cases, and concluding that the evidence thus establishes only that "the chance that anyone would attempt to [move the lift] with the platform fully elevated is only one in millions." *Ante* at ___. This conclusion ignores both our precedent regarding the role of evidence of similar accidents and, more importantly, the evidence of how and why the accident at issue here actually occurred.

With regard to the role of evidence of similar accidents, we acknowledged in *Hernandez* that it is difficult to apply the risk-utility analysis when the evidence suggests that it is unlikely that a product will cause any accidental harm, but when it does the harm will likely be severe. 2 S.W.3d at 261. In that case, we agreed that the evidence established that although "children will

---

[5] Genie's director of product safety also acknowledged that he had reports of "eight or nine or ten instances of people not doing it right." Whether there was evidence of thirteen instances of similar misuse or only three, however, is not significant to my conclusion.

almost certainly obtain access to lighters, . . . this will not happen often in comparison with the number of lighters sold, but . . . when it does happen the harm caused can be extreme." *Id.* at 260. In light of this, the manufacturer urged us not to apply the risk-utility analysis and instead determine the product's dangerousness based solely on whether the product was more dangerous that ordinary consumers would expect it to be. *Id.* at 261. The manufacturer noted that the Legislature has adopted just that approach for cases involving firearms and ammunition,[6] and urged us to judicially adopt the same approach for cigarette lighters, as courts in other jurisdictions had done. *Id.* at 261–62. We refused to do so, explaining that "we are reluctant to carve out exceptions to the risk-utility test that we have employed for years and that has been adopted by the Restatement, especially when consumer expectation is a factor to be considered in applying the risk-utility test and may in some cases outweigh all other considerations." *Id.* at 262 (emphasis omitted).

Importantly, the "difficulties" that led the Legislature to reject the risk-utility analysis in favor of the consumer-expectations test for firearms, like the "difficulties" that the manufacturer asserted in *Hernandez*, arose from the fact that, with both guns and cigarette lighters, it is highly unlikely that the product will cause any accidental harm, but when it does the harm is likely to be

---

[6] For public policy reasons, the Legislature has declared that the risk-utility analysis does not apply to a defective design claim against a manufacturer or seller of firearms or ammunition. *See* TEX. CIV. PRAC. & REM. CODE § 82.006(b) ("The claimant may not prove the existence of the defective design by a comparison or weighing of the benefits of the firearm or ammunition against the risk of personal injury, property damage, or death posed by its potential to cause such injury, damage, or death when discharged."). Instead, a claimant may prove that a firearm was defectively designed only by proving that the gun, as designed, did not function as an ordinary consumer of firearms would have reasonably expected. *Id.* § 82.006(a)(1) (claimant must prove that "the actual design of the firearm or ammunition was defective, causing the firearm or ammunition not to function in a manner reasonably expected by an ordinary consumer of firearms or ammunition"). We thus noted in *Hernandez* that "[d]ifficulties in applying the risk-utility test have prompted the Legislature to prescribe a consumer-expectation test for firearms and ammunition." 2 S.W.3d at 261.

severe. *Id*. at 261 (explaining the manufacturer's argument that "the risk-utility analysis is ill-suited for cases like this when the utility of a product design is largely satisfaction of consumer preference and the risk of harm, while improbable relative to the number of products sold, is often calamitous"). Although we "recognize[d] that such circumstances make the use of the risk-utility test difficult," *id*., we refused to reject the risk-utility analysis and concluded instead that "[e]ach of these considerations is relevant in assessing the risk," *id*. at 260.

We reached the same conclusion in *Martinez*, in which we acknowledged that "there ha[d] been few reported [similar] accidents involving tires with this particular warning label." *Martinez*, 977 S.W.2d at 337. We held that the relatively small number of similar accidents was "relevant, and perhaps would persuade many juries," but we stated that "we cannot say that it conclusively establishes that the tire is reasonably safe when weighed against the other evidence." *Id*. Under *Hernandez* and *Martinez*, the Court's matter-of-law conclusion here that the lift is not unreasonably dangerous because the jury heard evidence of only a few similar accidents is simply wrong. Although the number of similar accidents that the jury heard about was small compared to the "millions" of uneventful uses of the lift worldwide, we have held that such evidence does not conclusively establish that the relevant risk is "very slight."

In addition, the Court's reliance on the relatively small number of similar accidents ignores the evidence that the jury heard about how and why this accident occurred. Here, as in *Martinez* and *Hernandez*, the record contains other evidence[7] of the circumstances surrounding the accident, which would permit a reasonable juror to conclude that the relevant risk was high even if the

---

[7] The Court is simply incorrect when it says I conclude "a single accident is enough to show likelihood." *Ante* at ___. To the contrary, I conclude that the evidence I detail here is enough to show likelihood, or at least enough for a reasonable juror to find a likelihood sufficient to conclude that the risk outweighs the utility.

15

number of actual accidents was relatively low.

John Adams, the church's employee in charge of audio and HVAC, testified that he and the church's other maintenance staff used the lift "just about every week," and he asked someone to raise the jacks and move the lift with him in it "[e]very time" he used it. The church's IT director, Clifton Ray Poe, testified that he also used the lift, and he agreed that it was "fairly common to just loosen the feet and slide it over a little bit" with someone in it.

Adams claimed that he had read the entire user's manual, and admitted that he had seen the warning on the lift, that his supervisor at his prior job had told him not to move the lift "if any of the outriggers are raised," and that this warning was "fairly common sense." Despite these instructions, warnings, and "common sense" knowledge, however, Adams admitted that he raised the leveling jacks and moved the lift "every time" he used it. But in his case, he explained, the lift was usually extended only about 10 or 12 feet up, at a level where he "felt comfortable jumping" if necessary.

In this case, according to Adams, he moved the lift with Logan Matak in it at least twice before the accident occurred. The first time, Matak "came all the way down" before Adams moved the lift, and the second time he came down to "10 or 12 feet." Adams raised the leveling jacks only "[m]aybe an inch to two," safely moved the lift, and re-set the jacks, and Matak then raised the lift back up to 35–40 feet. About thirty minutes later, Matak asked Adams and Jimmy Boggan, Matak's supervisor, to move him again.

According to Adams, he then walked over to the lift and saw that Boggan was already raising a leveling jack, so he began to do the same. He claimed he "didn't look to see if [the lift] was raised," did not know whether Matak was still "30 feet up or 12 feet up," and just "assumed

16

[that Matak] was happy" being moved where he was. He explained that he did not even think about how high Matak was at the time because he was in a hurry and was just helping Matak while trying to do his own job: "When you're focused on getting your other job done and the other things you got coming behind that and you're trying to move at a rapid pace and the man said that he was ready to move, I never thought to look up and look for him."

Adams speculated that, if he had looked up and noticed how high Matak was, it would have caused him concern about trying to move the lift, and he would have asked if Matak was "sure" he wanted to be moved. Unfortunately, Adams did not look up. Instead, he looked down and saw that Boggan was already raising the leveling jacks on one side of the lift, so he knelt down and raised the other two jacks just off the floor, "[m]aybe half to an inch." As soon as he began to straighten back up, he heard Matak say "I'm leaning," and only then did he realize then that the lift was too high. He grabbed the lift to keep it from falling, but by then there was nothing he could do and "it kept coming," so he backed out of the way as Matak fell to his death.

Boggan also testified and confirmed that Adams said that they "push [a church employee] around in that [lift] all the time." Like Adams, Boggan claimed that, just before the fall, he raised the leveling jacks only enough to take "the pressure off it," enough to clear the carpet. Boggan testified that Adams was the one who suggested moving the lift with Matak in it, to save time, and that he and Matak agreed to "try it," but did so "on the total assumption that what [Adams] says is true, that the church uses that thing and moves it around all the time." Consistent with the testimony of Adams, Poe, and Boggan, the Matak's expert, Ken Zimmer, testified that "in the industry . . . it was widespread that people used these [lifts] without outriggers" in place.

17

Adams also testified that, although he purchased the lift involved in this accident and used it regularly, he received no formal training on its operation. Instead, his only "training" was when the maintenance staff at the church where he had previously worked showed him how the lift operates. Brent Sparks, the church's worship minister who had also used the lift, admitted that he did so even though he had never read the manual and was not familiar with its warning (and even though he considers himself to be "a careful person"). Boggan, who had worked as an electrician for Gulf Coast for eleven years, testified that he had never received any formal training on how to use "one of these lifts," had never read the manual for "this lift or any other lift like this," and did not read any of the warnings. Consistent with these admissions, Zimmer, the Matak's expert, explained that dealers regularly rent these lifts to non-professionals. In his opinion, "[m]anufacturers know that these machines are gonna be abused, misused, [the users] aren't gonna be trained properly. . . . [T]hey don't read the manual . . . . [They] rent the machine . . . and take it home and use it." Indeed, the portable, lightweight, inexpensive qualities that increase the lift's utility could make it more likely that untrained users will operate it.[8]

This testimony, combined with the evidence of at least three similar accidents involving the same lift design, would permit a reasonable juror to conclude, or at least draw the reasonable inference, that:

---

[8] Addressing the risks of cigarette lighters in *Hernandez*, we explained that "[t]he risk that adults, for whose use the products were intended, will allow children access to them, resulting in harm, must be balanced against the products' utility to their intended users." 2 S.W.3d at 259. "Whether adult users of lighters should be deprived of this choice of product design because of the risk that some children will obtain lighters that are not child-resistant and cause harm is the proper focus of the common-law risk-utility test." *Id*. at 260. In the same way, the risk that Genie's dealers and trained professionals will allow untrained non-professionals like Adams, Boggan, and Matak to operate the lift, resulting in harm, is a factor to be balanced against the lift's utility to its intended users under the risk-utility test. Based on the testimony of the witnesses in this case, a reasonable juror could conclude that the risks of unintended uses and users outweighed the utility of the lift for intended uses and users.

- Adams did not intentionally destabilize the lift knowing that it was "fully elevated," but instead assumed that the platform was at a lower and less dangerous level;

- Despite the warning and apparently obvious dangers, Adams believed it was safe to destabilize and move the lift, at least with the platform at a lower level, because he and others regularly did so without incident;

- Despite the warning and apparently obvious dangers, this is a common assumption, particularly in light of how often untrained non-professionals use the lift, and as a result, the use and movement of the lift when it is destabilized is a regular or common occurrence;

- Workers like Boggan and Matak, who do not use the lift very often, will follow the lead of workers like Adams, who do, and will try to move the lift when it is occupied despite the warning and apparently obvious dangers;

- The lift is not safe when it is moved or destabilized, even when the platform is at a lower level, because a fall when the platform is at any level can cause serious injuries and death;

- The fact that the lift can be, and commonly is, destabilized and moved at a lower level without incident makes the lift even more dangerous because it gives users a false sense that it is safe to move the lift with the platform at a lower level, which can lead to the kinds of assumptions and accidents that occurred here;

- Despite the warning and apparently obvious dangers, it is foreseeable and likely that operators are going to destabilize and move the lift when the platform is extended and occupied; and

- It is therefore likely that some users of this product will sustain serious injuries and deaths due to the misuse of the lift, despite the warning and apparent obvious dangers.

Based on this evidence, I conclude that reasonable jurors could have different views regarding "the user's anticipated awareness of the dangers inherent in the product," the "avoidability" of those dangers "because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions," the "expectations of the ordinary consumer," and thus the "gravity and likelihood of injury" from the product's use. *Timpte*, 286 S.W.3d at 311 (quoting *Grinnell*, 951 S.W.2d at 432). I would thus hold that the record

19

contains at least some evidence on which a reasonable juror could conclude that the relevant risk of the Genie lift outweighs its utility.

**E.** *Timpte* **and** *Martinez*

The Court relies heavily on *Timpte*, in which we held that a product's risks did not outweigh its utility as a matter of law. The plaintiff in *Timpte*, Gish, was injured when a gust of wind blew him off of the top of a dual-hopper trailer, onto which he had climbed to grab a malfunctioning silo downspout. 286 S.W.3d at 308. Gish alleged that the trailer was defectively designed because (1) the rail around the trailer's open top, on which he was trying to stand when he fell, was only five inches wide, and (2) the ladder that he had climbed, which was intended for access to an observation deck that sits below the rail, should not have had the top two rungs that he used to access the top of the trailer. *Id.* at 308–09. *Timpte* did not involve a jury trial; we held that the manufacturer was entitled to summary judgment.

As is the case here, we concluded in *Timpte* that the evidence established that the utility of the trailer's top rail design was "undeniably very high." *Id*. at 313. Also as here, the risk of falling was "obvious," the product warned users not to engage in the conduct that the plaintiff was engaged in at the time of his injury, and the relevant risk "stem[med] only from the risk that a user w[ould] ignore both [the] warnings and open and obvious dangers." *Id*. at 312–14. But what is present in this case that was not present in *Timpte* is evidence that ordinary users would commonly misuse the product despite the warning and apparently obvious dangers. We mentioned in *Timpte* that Gish had climbed up on the trailer "on several other occasions when the downspout would not lower," but we made no reference to any evidence that anyone other than Gish had ever done so. *Id.* at 308. While the evidence in *Timpte* thus could establish only that the risk was "extremely

20

low" and "very slight," *id.* at 313–14, the evidence of other users' common misuse of the Genie lift could establish that the risk was relatively high, given the availability of a safer alternative design, or at least permit a reasonable juror to conclude it was.

This case, therefore, is more analogous to *Martinez*, in which the plaintiff was seriously injured when he attempted to install a 16-inch tire on a 16.5-inch rim. 977 S.W.2d at 332. He did this in spite of the fact that the tire bore a "prominent warning label containing yellow and red highlights and a pictograph of a worker being thrown into the air by an exploding tire." *Id.* As here, the product's label prohibited the specific conduct the plaintiff was engaged in at the time of his injury and warned that such conduct could result in serious injury or death:

### D A N G E R

> NEVER MOUNT A 16" SIZE DIAMETER TIRE ON A 16.5" RIM. Mounting a 16" tire on a 16.5" rim can cause severe injury or death. . . .
>       ...
> NEVER inflate a tire which is lying on the floor or other flat surface. . . .
> NEVER inflate to seat beads without using an extension hose with gauge and clip-on chuck. . . .
> NEVER stand, lean or reach over the assembly during inflation.
>       ...
> Failure to comply with these safety precautions can cause the bead to break and the assembly to burst with sufficient force to cause serious injury or death.

*Id.* "Unfortunately, Martinez ignored every one of these warnings." *Id.*

The issue was the same in *Martinez* as it is here: "whether a manufacturer who knew of a safer alternative product design is liable in strict products liability for injuries caused by the use of its product that the user could have avoided by following the product's warnings." *Id.* at 331. We concluded that the answer was yes, observing that the defendant acknowledged at trial "that

21

warnings are an imperfect means to remedy a product defect," just as Curtin did in this case. *Id*. at 336. We agreed with the Restatement that warnings and safer alternative designs are merely "factors, among others, for the jury to consider in determining whether the product as designed is reasonably safe." *Id.* at 337. We specifically noted that "[t]he jury heard firsthand how an accident can occur despite the warning label, and how a redesigned tire would have prevented that accident." *Id*. "Unless the subject matter is solely for experts," we concluded, "jurors are capable of forming their own opinions from the record as a whole." *Id*. at 339.

Just as in *Martinez*, the jurors in this case were capable of forming their own opinions based on the evidence. They did so, and they did not all agree. Ten members of the jury found that the risks of Genie's lift outweigh its utility, making it unreasonably dangerous and thus defectively designed. But they did so thoughtfully, assigning only 55 percent of the responsibility for Matak's death to Genie, while assigning 20 percent to the church, 20 percent to Matak's employer, and 5 percent to Matak himself. Because some evidence supports the jury's findings, we are bound by the law to respect its decision.

### III.
### Conclusion

Having carefully reviewed the testimony, photographs, videos, other exhibits, and the trial court's instructions and questions to the jury, I probably would have concluded that Genie's lift was not unreasonably dangerous and thus not defectively designed, if I had been a juror at this trial. But I cannot say that my view is the only reasonable one. After five days of trial, ten members of this jury found that Genie's lift was defectively designed. Because there is some evidence in the record to support that verdict, this Court must affirm, even if each of us would have reached a different verdict. Thanking all twelve jurors for their service in this case, I respectfully dissent.

22

_____
Jeffrey S. Boyd
Justice

Opinion delivered: May 8, 2015